### In re Investigation Into the Existing Rates of Vermont Telephone Company, Inc.

[739 A.2d 671]

No. 98-332

Present: Amestoy, C.J., Dooley, Morse, Johnson and Skoglund, JJ.

Opinion Filed August 27, 1999

*Michael Marks* of *Tarrant, Marks & Gillies*, Montpelier, for Appellant.

*Leslie A. Cadwell*, Montpelier, for Appellee.

**Amestoy, C.J.** Appellant Vermont Telephone Company (VTel) appeals from a Public Service Board order requiring VTel to eliminate over a ten-year amortization period the value of what the Board characterized as a goodwill cost in the purchase price to be borne by the shareholders and not the ratepayers. We affirm.

This matter arises out of the sale of Contel of Vermont, Inc.'s (Contel) assets to three separate operating companies, one of which was VTel, and the impact of the structure of the acquisition on the rate base. The three acquiring companies sought permission from the Board to acquire Contel's assets and to provide local telephone service in Vermont. Both the asset acquisition and the operation of local telephone service required approval by the Board pursuant to 30 V.S.A. §§ 109 and 231 respectively. Under § 109, approval could only occur if the Board concluded that the acquisition would "promote the general good of the state." The Board conducted a detailed evaluation of the proposed transaction and on June 14, 1994, granted the acquiring companies' request to purchase the assets of Contel and issued VTel and the other two companies certificates of public good. The Board based its June 14, 1994, order (settlement order) on a proposed settlement among the parties to the acquisition proceeding, including VTel and the Department of Public Service.

In approving the acquisitions and issuing the certificates, the Board considered seven separate criteria for each of the three new operators. Addressing the seventh criterion — the impact of the proposed acquisition on established rates, terms and conditions of service — the Board stated that for each of the three companies local rates were expected to remain at their existing levels for at least two years. The settlement order contained additional provisions relevant to rates and the rate base, beginning with the condition that the operating companies not seek an increase in local rates for two years after the closing, unless "exogenous changes" made such an increase necessary. At the end of the two years, a service quality assessment of the companies was to occur to review, among other things, appropriate

rate levels and whether continuation of the franchises granted by the settlement order would be in the public interest.

The settlement order also addressed the investment it would allow the acquiring companies to recover in the future through rates. The Board stated: "The Operating Companies shall not include in future rates acquisition costs above regulatory book value for intrastate ratemaking, except as may be specifically authorized by law." The Board explained that its approval of the transactions did not imply inclusion in rates of all the costs associated with the debt and equity financings, stating:

> The proposed purchases include "goodwill," and/or a market premium, approaching some forty million dollars ($40,000,000). Expenditures to support such premiums will not be included in rates. This Board's long standing policy has been to consider only the book value, or historical cost, of tangible assets for rate-making purposes.

At the center of this appeal is the impact on ratepayers of the treatment of a Contel account called the accumulated deferred income tax account (ADITs or ADIT account). ADIT accounts allow a utility to finance investments with money owed to the federal government for taxes, thereby relieving the utility of having to finance that portion of the investment with its own equity or debt. Ratepayers pay the taxes reflected in the ADIT account in advance, providing the utility with a cost-free source of capital until it must pay the taxes.[1] The Board, in setting just and reasonable rates pursuant to 30 V.S.A. § 218, recognizes these prepayments and makes adjustments to reflect the cost-free capital. In the case of Contel and VTel, the ADIT has been treated as an offset to the rate base. The value of the ADIT to ratepayers is that, over time, as the offsets are made, the reduced rate base translates into lower rates than would be paid if the ADIT offset was eliminated. In essence, the utility is gaining a

---

[1] Like the regulatory commissions of every other jurisdiction, the Board has normalized tax allowances in compliance with IRS regulations so that Vermont utilities can take advantage of accelerated depreciation. The process of tax normalization allows public utilities to keep the tax effect of an accelerated depreciation for investment into new physical plant. As the years pass, plant investment, paid for with cost-free capital collected from ratepayers, is returned through the depreciation expense. The ADIT reserve reverses as the utility pays the tax to the IRS. At the time of the sale to Contel, approximately $5.1 million of ADIT's had been collected from ratepayers and invested into the physical plant. These funds are therefore also referred to as CIAC — capital in aid of construction.

cost-free "loan" from ratepayers between the time in which it collects the taxes and the eventual payment of the taxes to the IRS. The ratepayers benefit when and if the utility's use of the money is reflected by an ADIT offset to the rate base.

In the instant case, prior to VTel's acquisition, Contel's books included approximately $5.1 million in ADITs. The account reduced Contel's rate base until the money became payable to the federal government.[2] When VTel purchased a portion of Contel's assets, however, the tax repayment schedule changed. The structure of Contel's sale of its assets to the three acquiring companies triggered an Internal Revenue Service rule which required Contel to pay the taxes to the federal government before the acquisition was completed. Therefore, no portion of the ADIT account transferred to VTel.

In their proposed order, VTel and the settling parties asked the Board to include in the settlement order a condition related to Contel's $5.1 million ADIT account. The condition, as proposed by the parties and included in the Board's final order, provided:

> Within 90 days after Closing, the Operating Companies shall provide to the Board and the Department the methodology which was used to allocate among the three Operating Companies the depreciation reserve and deferred income taxes accrued by Contel of Vermont, Inc., as well as the results of such allocation methodology.

After the closing, VTel and the other acquiring companies filed a letter with the Board asking for an extension of time to file the explanation on the allocation methodology relating to the ADITs. The letter, dated October 28, 1994, stated that the three companies had reached a tentative agreement as to the appropriate methodology to allocate among them the ADITs accrued by Contel, and the results of the methodology. The letter did not state that the ADIT account had been eliminated as a result of the transaction. In their follow-up letter dated January 3, 1995, the operating companies explained that in order to meet IRS requirements, "all pre-acquisition deferred taxes must be eliminated from the company's ratemaking books." The letter stated that based on the companies' interpretation of the tax laws, "the successor corporations report that there were no deferred

---

[2] As VTel explains in its brief, the income taxes are only deferred and are repaid on a schedule that mirrors when taxes would have been due had normal depreciation rates applied. Accordingly, the ADIT account diminishes as taxes become due and increases as new qualifying investments allow accelerated depreciation for tax purposes.

income taxes on the books of Contel of Vermont to allocate among themselves."

On July 31, 1996, in accordance with the settlement order, the Board opened a rate investigation of VTel pursuant to its authority under 30 V.S.A. § 227(b). During the investigation, the Department recommended that the Board exclude from VTel's rate base approximately $1.8 million dollars relating to the ADIT account. VTel moved for dismissal of all issues relating to the ADIT account, and for summary judgment on the grounds that the settlement order precluded the Department's proposed elimination of the $1.8 million from the rate base and compelled the treatment of the ADITs elected by VTel. The Board's hearing officer denied the motions, ruling that the Board had not analyzed the effect of Contel's ADIT account in the settlement order except to require — as proposed by the companies themselves — that the three operating companies provide to the Board and the Department at a later date the methodology used to allocate the ADIT account and the results of such allocation methodology.

According to the Department's critique of the acquisition structure, when VTel acquired its portion of Contel, the ratepayer-generated ADIT account, which allowed for a rate base offset, did not transfer to VTel, but was nonetheless included in the rate base upon which VTel shareholders were entitled to a rate of return. Evidentiary hearings followed before a hearing officer of the Board, who concurred with the Department's proposal that VTel's rates be adjusted due to the nontransference of the ADIT account. The Board agreed that an adjustment was necessary, reiterating that when the sales transaction occurred, VTel paid cash to acquire its assets, and "[p]art of the assets it acquired was cost-free capital, provided by ratepayers and held by Contel as deferred taxes." The structure of the transaction, however, caused an acceleration of the income tax payments for which the ADIT account was reserved. Thus, *ratepayers lost the time-value benefit of the money they had provided, cost-free, to Contel in advance of the taxes being due.* Rather than ordering a reduction in rate base that would mirror the ratemaking treatment that would have occurred had the ADIT been transferred to VTel, the Board ordered that VTel amortize "the total value of the additional goodwill" over a ten-year period as an adjustment to its cost of service.[3] VTel

---

[3] It is undisputed that the overall economic impact of the Board's adjustment to cost of service is the same as the hearing officer's continuation of the rate base offset although

requested reconsideration of this order, and the Board denied any relief. VTel appeals.

VTel presents three points of contention with the Board's order. First, it argues that the adjustment is unlawful because it reduces VTel's revenues below the level of legitimate expenses and return on investment. Second, VTel disagrees with the Board's characterization of the amortization as an adjustment to eliminate goodwill; instead, VTel argues, the amortization disallows the return on investment in real assets. Third, VTel contends that the amortization collaterally attacks the Board's settlement order in which it approved VTel's acquisition of a portion of Contel. We address these arguments, presuming, as we must, that the Board's decision was valid. See *In re Green Mountain Power Corp.*, 162 Vt. 378, 380, 648 A.2d 374, 376 (1994). We will not set aside the Board's findings or conclusions unless VTel demonstrates that they are clearly erroneous. See *id.*

We address together VTel's first and second points on appeal, as the second point is essentially an elaboration and explanation of the first. VTel contests the legality of the proposed amortization because it: (1) reduces VTel's revenues below the level of legitimate expenses and return on investment VTel should be permitted to recover, and (2) does not represent any portion of the goodwill which was conclusively eliminated from the rate base in the settlement order approving the acquisition. It argues that public utility regulation should allow a utility to recover its expenses and investments but that here the Board made no finding that any of VTel's expenses or investments were imprudent, or were not used to provide service. Instead, the ordered reduction was based on the Board's conclusion that VTel's net investment would have been different if the acquisition transaction had been structured differently. VTel argues that the Board has relied on speculation as to what effect a different transaction structure would have had on rates in order to justify setting a rate below the level necessary to cover expenses and return on net investment.

We begin with the presumption of great deference to the Board's rate orders, so long as those orders are directed at proper regulatory objectives. See *id.* at 380, 648 A.2d at 376. When setting rates for a utility subject to its jurisdiction, the Board is guided by the

---

the year-by-year impact may be somewhat different. The Board apparently modified the method of recognizing the ADIT account to ensure there was no adverse consequence to VTel's ability to use accelerated depreciation for tax purposes in the future.

statutory requirement that ratepayers pay just and reasonable rates only. See 30 V.S.A. §§ 218(a), 227(b); *In re Central Vt. Pub. Serv. Corp.*, 141 Vt. 284, 288, 449 A.2d 904, 906-07 (1982) ("The Board's duty to set just and reasonable rates is well settled both by statute and our case law.") (citations omitted). Because the "complexities of utility regulation place an added premium upon the expertise of the Board in ratemaking," we assume a limited role in the ratemaking process. *Central Vt. Pub. Serv. Corp.*, 141 Vt. at 288, 449 A.2d at 907.

Based on the testimony of the Department's expert witness Randy Allen, VTel purchased 50.32 percent of Contel's assets for approximately $40.3 million. Of this amount, only $21.6 million represented the cost to VTel to purchase VTel's share of the physical plant — the remaining amount attributable to goodwill and other items excluded from the rate base. VTel's 50.32 percent of Contel's preexisting ADIT account was $2.6 million.[4] According to Allen, this meant that only $19 million of the cost of the physical plant was funded by VTel investors. The remaining $2.6 million cost of purchasing the physical plant represents funds generated by Contel's ratepayers and used for plant investment. Allen concluded that Contel used investor-supplied funds "to pay the government and that $2.6 million of the purchased plant still represents customer-supplied funds." The Board agreed with the Department expert that the recognition of cost-free capital as contributions in aid of construction was consistent with treating the $2.6 million as additional goodwill.

VTel claims that this characterization of the amortization amount as the total value of additional goodwill is wrong as a matter of law and fact. VTel acknowledges that a utility's rate base can include only its net book investment and cannot include any allowance for intangibles, including goodwill. See *In re Towne Hill Water Co.*, 139 Vt. 72, 74, 422 A.2d 927, 928 (1980) (explaining that "it is well established that the target of a rate base determination is the net value of the property upon which a return should be earned. The net value in issue is not fair market value, but net investment."). It argues, however, that the Board's description of the ADIT account as goodwill does not comport with the United States Supreme Court's definition which describes the concept as:

---

[4] Rather than removing the entire $2.6 million amount as goodwill, the Department recommended a $1.8 million deduction from rate base as temporary amortizable cost-free capital in aid of construction.

"the advantage or benefit, which is acquired by an establishment, beyond the mere value of the capital, stock, funds, or property employed therein, in consequence of the general public patronage and encouragement which it receives from constant or habitual customers, on account of its local position, or common celebrity, or reputation for skill or affluence, or punctuality, or from other accidental circumstances or necessity . . . ."

*Newark Morning Ledger Co. v. United States*, 507 U.S. 546, 555 (1993) (quoting *Metropolitan Bank v. St. Louis Dispatch Co.*, 149 U.S. 436, 446 (1893)). Assuming this definition, derived from a treatise on partnerships from 1841, is the standard by which Vermont's Public Service Board should determine what portion of an investment represents goodwill, we are not convinced that Contel's ADIT account fails to satisfy the definition. Contel's position as provider to Vermont residents of telephone services placed it in the unique position to generate its ADIT account from every one of its ratepayers. That cost-free capital was made possible due to Contel's local position as telephone service provider and the requirement that, in order to establish and maintain telephone service, ratepayers subscribe to and make payments to Contel.

VTel emphasizes that in approving the acquisition, the Board already disallowed almost $40 million in goodwill from the rate base and that ADITs were never included in the tally that yielded the $40 million figure. It asserts that it is undisputed that its net book investment never included an account associated with ADITs, that this account was paid over to the federal government and did not transfer to VTel, and that the amortization does not eliminate any of VTel's intangible assets or goodwill, but instead requires the offset of real cash against legitimate expenses and rate base under the guise of an offset to goodwill. To a great extent, we are dealing with a matter of semantics. The Board generally characterized assets that would not be reflected in allowed rates as "goodwill." The issue for the Board, and us, is one of proper ratemaking, not labeling. Even if the Board erroneously labeled the rate base in issue as "goodwill," we will not reverse its decision if it comports with its statutory responsibility and is supported by its findings and conclusions.

The Board is guided by the statutory requirement that ratepayers only pay just and reasonable rates. See 30 V.S.A. §§ 218(a), 227(b). Here, the Board's decision to make a cost of service adjustment by way of a ten year amortization resulted from the Board's review of

VTel's rates and its objective of establishing a rate base that reflected the net value of the property upon which shareholders should rightfully earn a return. See *In re Towne Hill Water Co.*, 139 Vt. at 74, 422 A.2d at 928. The parties agree that under Contel's ownership and operation, ratepayers generated the ADIT account, providing Contel with a cost-free source of capital to invest in its physical plant. The Board found that in acquiring its portion of Contel, VTel paid a premium — a portion of the cost-free source of capital — to allow Contel to pay off its ADIT account to the federal government consistent with the structure of the acquisition. The Board then concluded that this account was generated by ratepayers who, due to VTel's acquisition of Contel, lost the time value benefit of the money they had provided to Contel.

■    When the sale of Contel took place, the "return" to ratepayers on their cost-free "loan" to the utility stopped because, as a result of the acquisition structure, VTel paid the amount owed to the IRS rather than continuing to pay "interest" to the ratepayers. As a result of this acquisition structure, ratepayers were denied the time value benefit of the bargain. In order to correct this inequity, the Board simply adjusted the rates as if the ADIT account was not repaid to the IRS and the sale never occurred. The Board's findings were sufficient to support its conclusion that $1.8 million of the amount paid by VTel represented cost-free capital that ratepayers had provided to Contel and that this was a cost of acquisition that ratepayers should not rightfully bear. See *id.* ("Assuming use for utility purposes, appropriate costs of acquisition, not shown to be excessive, unwarranted or incurred in bad faith, are to be included in rate base after depreciation."). The Board did not attempt to deny shareholders appropriate costs of acquisition, but rather ordered the amortization as a way to achieve its objective of establishing a just and reasonable rate base. The determination that this objective would be satisfied by eliminating the cost to VTel of Contel's payment of ADITs to the federal government was not clearly erroneous.

VTel's remaining argument criticizes the amortization as a collateral attack on the Board's order approving VTel's acquisition of a portion of Contel. VTel argues that the Board, not the parties, chose the structure of the transaction and that it is undisputed that the Board understood that the ADITs would be paid to the federal government, that they would not pass on to VTel, and that such an acquisition structure would have an impact on rates. According to VTel, because the Board was equipped with all the necessary

information and power to reject the proposed structure of the transaction or impose on it any other conditions that it chose, the doctrines of res judicata and collateral estoppel prohibit the amortization ordered by the Board. VTel claims that central to the Board's analysis and consideration in approving the acquisition was the amount of the investment by the shareholders and what portion of that investment would be recognized in the future rates of the parties. Specifically, VTel stresses that the Board conclusively determined that VTel was permitted a return on its "net investment," excluding from that figure approximately $40 million in what the Board deemed "goodwill."

VTel contends that res judicata prohibits the Board's amortization order because the amount of investment that would be recognized in the future rates of the parties was conclusively determined in the acquisition docket, the Department was a party to the docket, the Board issued binding orders on rates which detailed what would and would not be included in rates, and the parties had a full and fair opportunity to litigate what portion of the investment would be included. See *Agway, Inc. v. Gray*, 167 Vt. 313, 316-18, 706 A.2d 440, 442 (1997) (res judicata bars litigation of claims which were or might properly have been litigated in previous action). VTel makes a similar argument using a collateral estoppel analysis. It argues that: the Department was a party to the acquisition docket; the ADIT account and its disposition was raised in the evidence presented during the acquisition process; the portion of the acquisition investment that would be recognized in rates was litigated and was made part of the final judgment; there was a full and fair opportunity to litigate the issue; and, preclusion is fair because VTel relied on the settlement order in closing on its purchase. See *Trepanier v. Getting Organized, Inc.*, 155 Vt. 259, 265, 583 A.2d 583, 587 (1990) (listing elements of collateral estoppel).

■ We disagree with VTel that either collateral estoppel or res judicata prevents the Board from issuing its amortization order. The core inquiry in either case is whether there was a "full and fair opportunity to litigate" the matter in the earlier action. *Cold Springs Farm Dev., Inc. v. Ball*, 163 Vt. 466, 468, 661 A.2d 89, 91 (1995). This matter originated from a proposed sale by Contel of its assets to three companies. The acquisition docket involved a determination by the Board of whether the transaction would serve the public good, taking into account a variety of factors. Although the Board considered potential rates, including a determination that an amount "approach-

ing some forty million dollars" in goodwill would be excluded from the rate base, the Board stated, and the findings support that:

> At no point did the parties to the transaction state that the structure of the arrangement would have an effect upon rates. Nor did the parties request that we approve any particular ratemaking treatment for the ADIT or any other component of the transaction, including the rather significant "goodwill" included in the purchase price. In fact, none of the material submitted by VTel demonstrated that any component of the transaction would affect rates.

Indeed, the Board accepted verbatim the provision in the acquiring parties' proposed settlement which gave the acquiring companies ninety days from the date of closing to provide to the Board and Department the methodology which was used to allocate the ADIT account accrued by Contel, as well as *the results of the allocation methodology*. We are unconvinced that rate base generally, or the effect of ADITs on the rate base specifically, was in any way an issue in the acquisition proceeding. In fact, it was as a result of the acquiring companies' proposed settlement that consideration of the impact of ADITs on rate base was deferred until a later date.

VTel argues, however, that in the settlement order, the Board defined exactly what net investment the companies could carry on their books for rates. According to VTel, the Board knew that the acquisition would create a new company with a net investment which excluded all ADITs. It stresses that the Board considered an exhibit submitted by the three companies during the acquisition process which revealed to the Board that the ADIT account on Contel's books would not be on VTel's post-acquisition balance sheet. The Board could have disapproved this aspect of the transaction, or approved it with conditions.

We disagree with this argument as well as VTel's assertion that, because the Board's settlement order prohibited the recovery of certain expenditures to support the cost of goodwill, it should be precluded or collaterally estopped from issuing the amortization order eliminating additional goodwill. VTel characterizes this aspect of the order as the Board having "explicitly addressed the investment that the Board would allow the acquiring companies to recover." The assertion that the Board's assessment of rate impact due to the acquisition was conclusive and final is unpersuasive given the provisions in the settlement order requiring a two-year stay on rate

changes and scheduling of a review of rates two years from the acquisition date consistent with its explicit statutory endorsement. See 30 V.S.A. § 227(b) (Board may order an investigation and hearing on the justness and reasonableness of existing rates). VTel minimizes the fact that if the Board's ruling was explicit on any aspect of the rate base, it was that the allocation methodology for the ADIT account was to be provided to the Board and the Department three months after the deal closed, and that rates would be reassessed two years after the date of closing. At no point during the acquisition process did VTel or the other two acquiring companies provide testimony or any other information in the record addressing the impact on rate base of the nontransference of the ADIT account, and in fact, ultimately elected an adjustment to the cost of service, rather than an elimination from rate base. The Board did not clearly err in delaying consideration of the impact upon rates of the ADIT account; but rather accepted VTel's proposal to refrain from such consideration until the acquiring companies were prepared to present all material information to the Board.

*Affirmed.*