2006 VT 124

**In re Appeal of Investigation into Existing Rates of Shoreham Telephone Company, Inc.**

[915 A.2d 197]

No. 05-077

Present: **Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.**

Opinion Filed November 17, 2006

---

58

*Paul J. Phillips* and *Elijah D. Emerson* of *Primmer & Piper, P.C.*, St. Johnsbury, for Appellant.

*June E. Tierney*, Department of Public Service, Montpelier, for Appellee.

¶ 1. **Reiber, C.J.** Shoreham Telephone Company, Inc. appeals from a Public Service Board order requiring that it reduce its revenues from intrastate telephone service by over $1.2 million. Shoreham contends: (1) the Board violated state and federal law by employing a methodology that impermissibly uses interstate revenues to subsidize intrastate rates; (2) the order will produce intrastate rates that are

confiscatory; (3) the Board's disallowance of income-tax expense from Shoreham's intrastate cost of service is unsupported by the evidence, unjust, and unreasonable; and (4) the order to establish a liability account for Shoreham's accumulated deferred income taxes (ADIT) was improper. We affirm.

¶ 2. Shoreham is a small telecommunications company that provides telephone services to approximately 3700 customers in several towns in Addison County. After reviewing Shoreham's 2002 supplemental financial reports, the Board found that there was "a significant possibility that Shoreham's intrastate revenues are higher than a just and reasonable level." Accordingly, the Board opened an investigation into Shoreham's existing rates and related issues, including the "benefits (and costs) of establishing Shoreham's rates using a total company (or residual) methodology." See 30 V.S.A. § 227(b) (Board may order investigation into justness and reasonableness of rates). The Department of Public Service participated in the proceedings as public advocate. *Id.* § 217 (Department of Public Service, through the Director of Public Advocacy, shall represent the public at hearings on rates).

¶ 3. Following the submission of substantial prefiled testimony by both parties and three days of technical hearings, the hearing officer filed a proposal for decision in August 2004 containing extensive findings and recommendations. Critical among these were his findings that in 2002 Shoreham's net profit of $1.2 million resulted in an overall rate of return of 38.8%, well in excess of industry standards; that application of a "total company" or "residual ratemaking" methodology would ensure that Shoreham — an "average schedule" company since 1982 — received no more than 100% of its intrastate costs, plus a reasonable rate of return; that Shoreham is a Subchapter S corporation which pays no direct income tax, and therefore should reduce its expenses attributed to income taxes; and, finally, that Shoreham should be required to establish a regulatory liability account equal to the difference between its current ADIT balance of $611,143 and the ADIT balance that would have been produced had Shoreham been taxed at the actual corporate income tax rate since 1999. In total, the hearing officer recommended that Shoreham's intrastate rates be adjusted to reduce its intrastate income by $1,126,725.

¶ 4. In November 2004, the Board issued its ruling adopting the proposed decision largely in its entirety, subject to several specific

modifications, including a total elimination of the income tax expense from the calculation of Shoreham's legitimate expenses. This resulted in a required reduction of $1,268,459 from Shoreham's intrastate rates. The Board authorized Shoreham to reduce its intrastate rates in three equal stages over a seventeen-month period, and allowed it either to keep the new regulatory account on its books until the liability for which it was collected occurred or return it to taxpayers in the form of amortizations over a reasonable period of time. In response to Shoreham's subsequent motion to alter or amend, the Board modified its decision in several relatively minor respects, but otherwise denied the motion. This appeal followed.

## I.

¶ 5. A brief review of the regulatory backdrop is essential to a proper resolution of Shoreham's several claims on appeal. Shoreham is a local exchange carrier (LEC) under state and federal law, subject to separate regulation by the state and federal governments. See *Crockett Tel. Co. v. FCC*, 963 F.2d 1564, 1566 (D.C. Cir. 1992) (reviewing historical basis of federal regulation of interstate common carrier services and state regulation of intrastate services). The Federal Communications Commission (FCC) regulates interstate and foreign telecommunications services, while states retain jurisdiction to regulate intrastate services. 47 U.S.C. §§ 151, 152(b). In Vermont, the Board exercises local jurisdiction to ensure that Shoreham's intrastate rates are "just and reasonable." 30 V.S.A. § 218.

¶ 6. To implement this dual scheme of regulation, "a utility's 'revenues, investment, and expenses must be apportioned between the interstate and intrastate jurisdictions.'" *Pine Tree Tel. & Tel. Co. v. Pub. Utils. Comm'n*, 631 A.2d 57, 62 (Me. 1993) (quoting *Mid-Plains Tel. Co.*, 5 F.C.C.R. 7050, 7050 (1990)), *aff'd sub nom. Crockett Tel. Co. v. FCC*, 963 F.2d 1564 (D.C. Cir. 1992). This process of apportionment is known as jurisdictional separation. *Crockett*, 963 F.2d at 1566; see *Smith v. Illinois Bell Tel. Co.*, 282 U.S. 133, 148, 150 (1930) (holding that "reasonable measures" of separations are "essential to the appropriate recognition of the competent governmental authority in each field of regulation"). Four years after the decision in *Smith*, Congress authorized the FCC to classify carriers' costs as interstate or intrastate for purposes of federal regulation, 47 U.S.C. § 221(c), and the FCC eventually codified a formal, nonexclusive, cost-based separation procedure at 47 C.F.R. pt. 36 (1991). See *Crockett*, 963

F.2d at 1566-67 (holding that federal recognition of the cost-based ratemaking and separations procedure was not intended to exclude other methodologies).

¶ 7. From its inception, the separations requirement was recognized by the United States Supreme Court to be a costly, complex, and necessarily inexact process, in part because in many cases the equipment and plant used to provide intrastate service is also used to provide interstate service. See *Smith*, 282 U.S. at 150 (observing that while separation is essential, because of "the difficulty in making an exact apportionment of the property . . . extreme nicety is not required"); accord *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 360 (1986) ("[W]hile the [Communications] Act would seem to divide the world of domestic telephone service neatly into two hemispheres . . . in practice, the realities of technology and economics belie such a clean parceling of responsibility.").

¶ 8. To save companies the often substantial expense and effort of preparing expert cost studies, the FCC has for many years permitted some smaller carriers to derive their interstate costs from an "average schedule," essentially an estimate based on general industry data approximating the costs of a similarly situated hypothetical exchange company.[1] See *Crockett*, 963 F.2d at 1567 (discussing the history and methodology underlying use of average schedules); *Nat'l Ass'n of Regulatory Util. Comm'rs v. FCC*, 737 F.2d 1095, 1127 (D.C. Cir. 1984), *cert. denied*, 469 U.S. 1227 (1985) (same); *Pine Tree*, 631 A.2d at 62-63 (same). The FCC categorizes LECs as either "cost-based" or "average-schedule" companies for purposes of compensating them for their federal jurisdictional costs from an overall interstate "settlement pool." A cost-based company tracks and reports its interstate costs based on its actual costs. An average-schedule company does not track or report its actual interstate costs, but

---

[1] Historically, AT&T used a cost-based separations approach to determine each Bell Operating Company's costs of providing interstate service, which the FCC later codified in its rules after the divestiture of AT&T in 1983. *Pine Tree Tel. & Tel. Co. v. Pub. Utils. Comm'n*, 631 A.2d 57, 63 (Me. 1993); *Mid-Plains Tel. Co.*, 5 F.C.C.R. 7050 (1990). For small, independent telephone companies, the FCC allowed AT&T to distribute revenues by a system of "settlements" based on "average schedules." *Pine Tree*, 631 A.2d at 63. Those small, independent companies are still, today, allowed to use average schedules to estimate their interstate costs. *Id.*

instead recovers its estimated interstate costs based on the average schedule.[2]

¶ 9. Because the average-schedule system used by federal regulators conveniently designates a certain portion of a carrier's overall costs as interstate, "[u]nsuprisingly, several states have come to rely on average schedules for their own intrastate ratemaking purposes." *Crockett*, 963 F.2d at 1567. Just as many states have subtracted from a cost-based carrier's total costs its actual interstate costs in order to derive from the remainder its intrastate costs, so a number of states deduct from the total cost base of an average-schedule carrier that portion attributed by the average schedule to interstate usage, "and treat the residuum as intrastate." *Id.*; see also *Pine Tree*, 631 A.2d at 63 (explaining that "some state regulators simply subtract these [average-schedule] interstate costs from the company's total costs and treat the residuum as intrastate costs"). This intrastate ratemaking method is known as "total company" or "residual ratemaking." *Crockett*, 963 F.2d at 1567.

¶ 10. The residual-ratemaking process, in the context of an average-schedule company, has been described as follows:

> [First], the commission determines a reasonable level of expense and a reasonable return on the net investment rate base for the total company. The commission then deducts the amount of average schedule payments from the total company revenue requirement to determine the intrastate portion of the total company revenue requirement. Intrastate rates are then established to recover this residual amount.

*Pine Tree*, 631 A.2d at 63 (quotation omitted). Thus, state regulators using residual ratemaking — like the Board here — assume that the intrastate revenue requirement is equal to the company's total revenue

---

[2] Under FCC rules, LECs receive compensation, or "access revenue," from interstate carriers for use of the LEC local networks. See 47 C.F.R. § 32.5082. Many smaller LECs, including Shoreham, participate in an "interstate access pool," administered by the National Exchange Carrier Association. See *id.* §§ 69.601-69.612. LECs recover "settlements" from the pool to recover costs of providing interstate services plus a pro rata share of the pool's interstate earnings. See *id.* § 69.605(a). Companies are categorized as "cost-based" or "average schedule" for purposes of recovering their federal jurisdictional costs from the interstate settlement pool.

requirement less revenue deemed by the average schedule to be interstate. *Id.*[3]

¶ 11. As the *Crockett* court noted, the residual-ratemaking method "has a significant impact on jurisdictional separations." 963 F.2d at 1567. While an average-schedule company that uses the cost-based method might enjoy a recovery in excess of its total revenue requirements (when the average federal "settlement" exceeds the company's actual interstate costs), the use of residual ratemaking generally "will guarantee 100% recovery, no more, no less." *Pine Tree*, 631 A.2d at 64 (quotation omitted); see also *Crockett*, 963 F.2d at 1568-69 (illustrating how "a carrier using the average schedule to calculate costs of interstate service but determining actual costs for intrastate ratemaking could be provided with a total base for rate calculation exceeding 100 percent of its costs").

¶ 12. In the seminal *Crockett* decision, a federal appeals court upheld the use of residual ratemaking as a lawful separations methodology against a challenge brought by several LECs. The court readily acknowledged that, "[b]y relying on an average schedule, residual ratemaking only approximates actual intrastate costs, while Part 36 [the FCC approved cost-based method] requires detailed cost studies which allow greater precision in figuring the proper intrastate ratemaking base." *Crockett*, 963 F.2d at 1568. Nevertheless, the court rejected the LECs' claims that Congress had preempted the field by approving the use of actual cost-based ratemaking, holding — to the contrary — that states remain free to employ other methodologies, including residual ratemaking, as a means to comply with the Supreme Court's constitutional admonition in *Smith* for jurisdictional separation. *Crockett*, 963 F.2d at 1573-74.

¶ 13. The use of residual ratemaking received further approval from the Maine Supreme Judicial Court in *Pine Tree*. There, as here, a small telephone company challenged the state utility commission's use of the total-company method to determine the carrier's intrastate rates. *Pine Tree*, 631 A.2d at 62. The company asserted, among other

---

[3] A company's "revenue requirement" is the "total amount that a carrier is entitled to charge for services." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 365 (1986). It is the "sum of [the carrier's] current operating expenses, including taxes and depreciation expenses, and a return on its investment 'rate base.'" *Id.* The "rate base" has been described as the "net value of the property upon which a return should be earned." *In re Vt. Tel. Co.*, 169 Vt. 476, 482, 739 A.2d 671, 675-76 (1999) (quotation omitted).

claims, that the method "use[s] revenues generated from interstate customers to benefit intrastate customers violat[ing] the ... prohibition against cross-subsidization." *Id.* at 66 (quotation omitted). The argument rested on the fundamental principle, dating from as early as *Smyth v. Ames*, 169 U.S. 466 (1898), that one class of customers should be neither burdened by the losses nor benefitted by the profits generated in connection with services accorded a different class of customers. See *El Paso Elec. Co. v. Fed. Energy Reg. Comm'n*, 667 F.2d 462, 468 (5th Cir. 1982) (reviewing history and rationale of principle that "with respect to ratemaking, each jurisdiction or class of customers should pay its own way"). The rule against "cross-subsidization" — essentially a corollary to the preemption principle that states may not intrude upon areas, such as interstate commerce, regulated by the federal government — promotes the jurisdictional separation essential to regulatory ratemaking. *Id.*

¶ 14. The Maine court rejected the cross-subsidization claim, distinguishing its earlier decision in *Maine Water Co. v. Public Utilities Commission*, 482 A.2d 443 (Me. 1984), where it found that the utilities commission had improperly attempted a "dollar-for-dollar flow[-]through" of gains from one division to another. *Pine Tree*, 631 A.2d at 66. The case before it was more akin to *Millinocket Water Co. v. Maine Public Utilities Commission*, 515 A.2d 749 (Me. 1986), where the commission had used a "[c]ompany's parent as proxy for determining [the] cost of equity and did not attempt to effectuate a flow-through." *Pine Tree*, 631 A.2d at 66 (internal quotation omitted). The court in *Pine Tree* thus concluded that, in employing residual ratemaking, "the commission relied on average schedules as a proxy to determine Pine Tree's interstate costs and did not attempt to effect a flow-through of gains from Pine Tree's interstate activities to subsidize its intrastate activities." *Id.* Accordingly, it found no violation of the separations principle.

¶ 15. With this regulatory background in mind we turn to Shoreham's principal claim that the Board erroneously relied on residual ratemaking in violation of state and federal law. As noted, Shoreham has been an average-schedule company since 1982, recovering its interstate costs based on the FCC-approved generalized industry average, and thereby avoiding the significant administrative burden and expense of tracking its actual costs. Nevertheless, Shoreham argued below, and renews its claim here, that the Board was prohibited from employing the average schedule under the residual ratemaking method. Shoreham urged reliance, instead, on a "proxy" cost

study that it had commissioned which purported to show that its intrastate revenues were deficient by $168,028. The Board declined, finding that the proxy study relied upon calculations that "appear to be inconsistent with the FCC's [jurisdictional separations regulations] and [the National Exchange Carrier Association's] guidelines" causing its "accuracy and appropriateness" to be "questionable."

¶ 16. The Board opted, instead, to apply the residual-ratemaking method, noting that Shoreham's choice to remain an average-schedule company had allowed it to enjoy an excessive recovery, with intrastate customers paying for the same plant and operations that Shoreham was already being compensated for through interstate rates. Applying residual ratemaking, the Board concluded, would ensure that intrastate rates are just and reasonable, and would limit Shoreham's recovery to 100% of its total revenue requirements. The result, as noted, was an order requiring Shoreham to reduce its intrastate revenues by $1,237,143, to $822,404.

¶ 17. Orders of the Board enjoy a strong presumption of validity. *In re Green Mountain Power Corp.*, 162 Vt. 378, 380, 648 A.2d 374, 376 (1994). Where the Board exercises ratemaking authority, we afford substantial deference to its decisions so long as the Board's actions "are directed at proper regulatory objectives." *In re Green Mountain Power Corp.*, 142 Vt. 373, 380, 455 A.2d 823, 825 (1983). In recognition of the complexities of utility regulation, we defer to the Board's particular expertise in ratemaking and assume a limited role in the process. *In re Cent. Vt. Pub. Serv. Corp.*, 141 Vt. 284, 288, 449 A.2d 904, 907 (1982). Thus, we accept the Board's findings and conclusions that are not clearly erroneous, *In re Vermont Telephone Co.*, 169 Vt. 476, 481, 739 A.2d 671, 674-75 (1999), and in reviewing those findings "we give great deference to the particular expertise and informed judgment of the Board." *In re E. Georgia Cogeneration Ltd. P'ship*, 158 Vt. 525, 531, 614 A.2d 799, 803 (1992).

¶ 18. With this highly deferential standard in mind, we can find no basis to disturb the Board's considered judgment that use of the residual ratemaking methodology in this case yielded a just and reasonable intrastate rate consistent with federal law. As the Board succinctly yet comprehensively explained, residual ratemaking merely

> accepts the interstate/intrastate cost separation factors that
> are inherent in the "average schedule" interstate rates. The

methodology then applies the FCC's allowed 11.25% return on equity to these interstate cost allocations, thus assuring that Shoreham has a fair opportunity to recover its interstate costs. It also uses an intrastate return rate that we establish for determining a return on intrastate investment, and then employs a weighted average of the interstate and intrastate returns in conjunction with the total regulated ratebase and expenses of Shoreham to produce a revenue requirement for the Company as a whole. Thereafter, the methodology simply derives the state share of revenues by subtracting interstate revenues (which are based upon the average schedule allocations plus the FCC-determined return) from the total. Under this approach, Shoreham has a reasonable opportunity to earn its authorized return on equity (or exceed it) in the interstate jurisdiction because the Board simply accepts the FCC's allocations and return on equity. Similarly, Shoreham can earn a fair return on its intrastate investment (as determined using the implied "average schedule" separations factors).

Shoreham's vigorous claims to the contrary notwithstanding, we are not persuaded that the Board erred in rejecting its assertion that residual ratemaking effects an impermissible shift or reclassification of interstate revenues for intrastate purposes. As the Board found, the methodology is premised precisely on the separations requirement. It merely takes advantage of the simplicity of the average-schedule cost allocation — which Shoreham has retained for over twenty years for interstate cost purposes — for use in intrastate ratemaking.

¶ 19. Furthermore, as noted earlier, courts that have addressed residual ratemaking have determined that it is a sound methodology which does not impermissibly intrude into federal jurisdiction. "Insofar as the cost basis underlies average schedule ratemaking, there is no inconsistency in allowing the states to base their rates on the same relatively inexpensive method of computing the facility component of ratebase that the federal regulator uses," and it is reasonable for states to "view the average schedule computation as an informal jurisdictional separation" that complies with the jurisdictional restraints on states. *Crockett*, 963 F.2d at 1572-73 (holding that residual ratemaking is not preempted by the Communications Act). Nor, as *Pine Tree* explained, did the Board's reliance on the average-schedule settlement impermissibly attempt to cross-subsidize ratepayers. See 631 A.2d at 66 (concluding that the utility commis-

sion had properly "relied on average schedules as a proxy to determine Pine Tree's interstate costs and did not attempt to effect a flow-through of gains from Pine Tree's interstate activities to subsidize its intrastate rates").

¶ 20. As noted, the Board's investigation showed that Shoreham's use of mixed methodologies of cost recovery (actual costs for intrastate, average schedule for interstate) resulted in an excessive recovery. As a result of Shoreham's use of different cost-allocation methods in different jurisdictions, the Board found, Shoreham's ratepayers were paying for some of the same plant and expenses twice — once through interstate rates and once through intrastate rates. This was made evident by the discovery that Shoreham's overall rate of return was 38.8%, far beyond typical rates of return for regulated industries, and resulting in a windfall for Shoreham. The use of residual ratemaking, the Board concluded, properly bars Shoreham from recovering more than 100% of its revenue requirements, and therefore is consistent with state and federal regulatory policy.

¶ 21. The Board also properly rejected Shoreham's argument that interstate revenues were subsidizing intrastate rates as a factual matter, noting that to properly analyze the claim it would need to compare Shoreham's interstate revenues and costs based on the sort of "proxy" methodology which Shoreham provided for its intrastate costs. No proxy study for interstate costs was offered, however, because Shoreham does not use a cost-based approach for interstate ratemaking. Similarly, Shoreham's claim that its actual intrastate costs exceeded its residual ratemaking intrastate costs was based on a proxy study which the Board found to be unreliable, a finding which we do not second-guess. *In re Cent. Vt. Pub. Serv. Corp.*, 167 Vt. 626, 627, 711 A.2d 1158, 1160 (1998) (mem.). Shoreham's additional reliance on two out-of-state cases to support its cross-subsidization claim is equally unpersuasive, as both decisions were premised upon a fundamental failure to separate, rather than the use of residual ratemaking as a separations methodology. See *United States v. RCA Alaska Commc'ns, Inc.*, 597 P.2d 489, 499 (Alaska 1979); *Elkhart Tel. Co. v. State Corp. Comm'n*, 640 P.2d 335, 338 (Kan. Ct. App. 1982).

¶ 22. "The statutory basis of the Board's regulatory authority is extremely broad and unconfining with respect to means and methods available to that body to achieve the stated goal of adequate

service at just and reasonable rates." *In re Green Mountain Power Corp.*, 142 Vt. at 380, 455 A.2d at 825. The Board's decision here to apply residual ratemaking to Shoreham was well within its authority and was directed at proper regulatory objectives. Accordingly, it may not be disturbed.

## II.

¶ 23. Shoreham next claims that the Board violated state law in applying residual ratemaking because it lacks authority to use revenues from interstate operations to establish just and reasonable intrastate rates. Shoreham's argument is premised on the following passage from *In re New England Telephone & Telegraph Co.*, 115 Vt. 494, 503, 66 A.2d 135, 141 (1949):

> [I]t needs no citation of authorities to show that the jurisdiction of the commission extends only to intrastate operation and matters pertaining thereto. It is so limited by statute. . . . The amount of property in this state devoted to interstate operations cannot properly be included in a rate base used to determine just and reasonable rates to be charged for intrastate service. No "end result" could be said to be just and reasonable when reached by such a method.

¶ 24. Shoreham argues that this passage prohibits the Board "from including interstate operations in a rate base . . . to determine just and reasonable intrastate rates" and that the residual-ratemaking method simply reclassifies interstate revenues as intrastate revenues. As previously discussed in connection with Shoreham's federal claim, however, the residual-ratemaking method properly separates interstate and intrastate property, and Shoreham has not established that it results in impermissible cross-subsidization. Furthermore, the quoted passage from *New England Telephone* related to a finding incorporating the company's average combined interstate and intrastate investment which we forbade the Board to use on remand, explaining that the interstate and intrastate property must be properly separated between state and federal jurisdictions. *Id.* The case did not concern residual ratemaking, and provides no basis to conclude that the Board here exceeded its jurisdiction.

## III.

¶ 25. Shoreham next contests the Board's decision to eliminate the income-tax expense from its cost of service. The Board noted that

Shoreham is a Subchapter S corporation for income-tax purposes and as such does not pay federal or state income taxes as a corporate entity, instead "passing through" that tax obligation to its individual shareholders. Shoreham had nevertheless calculated its revenue requirement for ratemaking purposes at the 40.44% C-Corporation tax rate for federal and state tax payments, and had been collecting those monies from ratepayers. Both the Department and the hearing officer recommended that because Shoreham distributes net income to its shareholders who pay taxes at individual tax rates of 25.12%, Shoreham's income-tax expense should be adjusted to compensate its shareholders at the amount of their 25.12% personal income tax rates. Testimony from the Department's Director of Finance recognized, however, that the Board had several options, and that one of these was to find that personal taxes paid by the shareholders were irrelevant to the company's legitimate expenses. In such a case, the Board would be justified in disallowing the income-tax expense in its entirety.

¶ 26. In departing from the recommendation of the hearing officer and the Department, the Board concluded that it was improper to include an income-tax expense because rates are based on adjusted test-year expenses and "payment of taxes simply was not one of Shoreham's *actual* expenses in the 2002 test year."[4] The Board noted that Shoreham enjoyed other benefits from its Subchapter S corporate form, and that it was a voluntary choice by Shoreham to choose this form. The Board thus concluded that it was neither just nor reasonable to require ratepayers to compensate Shoreham for a nonexistent tax liability. See Hastings v. Village of Stowe, Elec. Dep't, 125 Vt. 227, 231, 214 A.2d 56, 59 (1965) (upholding Board's elimination of income-tax expense not actually incurred).

¶ 27. Although Shoreham suggests that its due process rights were somehow compromised by the Board's decision to adopt a position contrary to the recommendation of the hearing officer and the Department, we discern no violation. As noted, Shoreham was on notice that disallowance was an option through the testimony of the

---

[4] In its order regarding Shoreham's motion to alter or amend, the Board increased Shoreham's expenses slightly, by $4,773, to treat Shoreham's owner-investors the same as other Vermont investors of public companies with regard to investment earnings.

Department's Director of Finance. That testimony, in turn, supported the view that *no* income-tax expense should be recognized as a legitimate expense if the Board concluded that such taxes were irrelevant in the case of a company, such as Shoreham, which simply paid no corporate tax. The Board's conclusion in this regard was neither contrary to the evidence nor unjust and unreasonable. Accordingly, it may not be disturbed.

## IV.

¶ 28. Related to its previous claim, Shoreham also disputes the Board's order that it establish a liability account for its ADIT and repay that amount to ratepayers because Shoreham has no tax liability. In this regard, the Board made the following pertinent findings.

> [ADIT] represents the amount of cost-free capital provided by customers through rates to pay for anticipated income taxes that have been deferred. Differences in the amount of actual income taxes paid and the amount of income taxes deferred to a future period arise due to the difference in the recognition of revenues and expenses for ratemaking purposes and income tax purposes. Shoreham's cost of service filing in this case reflects a rate base deduction for ADIT of $611,143 which was based on Shoreham's historical application of the C-Corporation income tax rate for ratemaking purposes. The balance in Shoreham's ADIT account represents customer funds that were paid prior to December 31, 2002, for future anticipated income tax obligations. Shoreham does not pay income taxes but reimburses the shareholders for their personal income tax obligation.

¶ 29. The parties agreed below that if the Board reduced the income-tax expense it must also reduce the ADIT balance to reflect the change in income-tax rates, but disagreed on what to do with the excess funds that Shoreham had generated by applying the C-Corporation rates. Shoreham proposed to keep the difference. The Board disagreed. Based on its finding that Shoreham pays no state or federal income taxes and thus has no future deferred income tax liability, the Board concluded that it was a "basic fact" that the existing ADIT account represented ratepayers' funds, and ordered Shoreham to return those funds to ratepayers. The Board reasoned that it had authorized Shoreham to collect from ratepayers in

anticipation of future tax liabilities, and that Shoreham knew the funds were advance contributions from ratepayers to be held for future liabilities. The Board concluded, "[t]his basic fact that the ADIT represents customer funds is unchanged now that it is apparent that the future liability has now been reduced or eliminated."

¶ 30. Shoreham now claims that the Board cannot order return of the ADIT funds to ratepayers because it never authorized Shoreham to collect ADIT funds in the first place. Because the Board's prior order regarding Shoreham's rates was a stipulated bottom-line settlement in which the Board did not specifically rule on particular costs, Shoreham asserts that it was never actually authorized by the Board to collect income taxes in advance from its ratepayers in anticipation of future tax liabilities. Accordingly, Shoreham argues, the ADIT balance must be set at zero.

¶ 31. We are not persuaded. Whether or not specifically authorized by the Board, the evidence shows that Shoreham collected ADIT from ratepayers. Shoreham acknowledged as much below, and its own cost-of-service filing reflected a rate base deduction for ADIT in the amount of $611,143, which had been collected from ratepayers based on Shoreham's historical application of the C-Corporation income-tax rate for ratemaking purposes. Nor, as Shoreham claims, is the Board's ruling inconsistent with its decision to disallow Shoreham's income-tax expense going forward. The record and findings support the Board's conclusion that Shoreham has been collecting funds from ratepayers for an income-tax expense it did not and will not incur; that the ADIT balance represents ratepayer funds collected in the past; and that these funds should be returned to ratepayers. Nor, finally, does the Board's action amount to retroactive ratemaking. "Retroactive ratemaking occurs when rates are set at a level that permits a utility to recover past losses, or that requires it to refund past excess profits, that resulted from a disparity between projected expenses of a prior rate base and actual incurred expenses." *In re Green Mountain Power Corp.*, 162 Vt. at 387, 648 A.2d at 380. ADIT·funds are not profits; they are funds collected from ratepayers to be held for a future tax liability that in this case will not arise. The Board did not engage in illegal retroactive ratemaking in ordering Shoreham to refund its ADIT balance.

## V.

¶ 32. Shoreham's final two arguments require no extended discussion. Shoreham claims that the Board impermissibly exceeded its jurisdiction in suggesting that it would likely impute "total company" average-schedule ratemaking to Shoreham even if Shoreham decided to make a federal-law election to convert to cost basis. The Board's statement in this regard was contingent on the effect of such an election on rates, and was dictum in any event, concerning a speculative scenario that had not occurred and was not before it. Accordingly, the issue is not ripe for decision by this Court. See *In re Robinson/Keir P'ship*, 154 Vt. 50, 57, 573 A.2d 1188, 1192 (1990) ("Courts will ordinarily not render decisions involving events that are contingent upon circumstances that may or may not occur in the future.").

¶ 33. Lastly, Shoreham asserts that the Board's ruling was confiscatory because the shift in revenues will result in intrastate rates that fail to compensate Shoreham for its actual intrastate property costs, and therefore deprive Shoreham of the value of its interstate property without just compensation. We agree with the Department, however, that Shoreham failed to properly raise this issue below, and therefore may not raise it on appeal. See *Town of Hinesburg v. Dunkling*, 167 Vt. 514, 523-24, 711 A.2d 1163, 1168-69 (1998) (issue must be raised below to be preserved for review on appeal). While Shoreham cites to two sentences in its exceptions to the hearing officer's proposed decision referring to the recommended reduction as confiscatory, this was not adequate to afford the Board a fair opportunity to address the issue. See *In re White*, 172 Vt. 335, 343, 779 A.2d 1264, 1270-71 (2001) (to properly preserve issue for review, party must present it with sufficient specificity and clarity to afford trial court fair notice and opportunity to rule on it). Moreover, as noted in connection with its subsidization claim, Shoreham provided no reliable evidence of its actual intrastate cost to support the assertion that confiscation will occur as a result of the Board's order.

*Affirmed.*