963 F.2d 1564
 295 U.S.App.D.C. 397
 CROCKETT TELEPHONE COMPANY, Ooltewah-Collegedale Telephone
Company, Peoples Telephone Company, West Tennessee
Telephone Company, and ALLTEL Tennessee,
Inc., Petitioners,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
United States Telephone Association Public Service
Commission of Wisconsin National Association of
Regulatory Utility Commissioners Intervenors.
 No. 90-1604.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Oct. 1, 1991.
Decided May 26, 1992.
 
 [295 U.S.App.D.C. 398] Petition for Review of an Order of the Federal Communications Commission.
 David R. Poe, with whom Loretta J. Garcia, Washington, D.C., Hermann Ivester, H. Edward Skinner and Valerie F. Boyce, Little Rock, Ark., for ALLTEL Tennessee, Inc., and T.G. Pappas, Nashville, Tenn., for Crockett Telephone Co., Ooltewah-Collegedale Telephone Co., Peoples Telephone Co., and West Tennessee Telephone Co. were on the joint brief, for petitioners.
 Laurel R. Bergold, Counsel, F.C.C., with whom Robert L. Pettit, Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, and John E. Ingle, Deputy Associate Gen. Counsel, and James F. Rill, Asst. Atty. Gen., Catherine O'Sullivan, and Robert Wiggers, Attys., Dept. of Justice, Washington, D.C., were on the brief, for respondents.
 
 
 1
 William Malone and Martin T. McCue, Washington, D.C., were on the brief for intervenor U.S. Telephone Ass'n.
 
 
 2
 Michael S. Varda and Steven M. Schur, Madison, Wis., were on the brief for Public Service Com'n of Wisconsin.
 
 
 3
 Paul Rodgers, Charles D. Gray, and James Bradford Ramsay, Washington, D.C., were on the brief for intervenor Nat. Ass'n of Regulatory Utility Com'rs.
 
 
 4
 Henry Walker was on the brief for amicus curiae urging that the petition for review be dismissed.
 
 
 5
 Before: EDWARDS, SENTELLE, and HENDERSON, Circuit Judges.
 
 
 6
 Opinion for the Court filed by Circuit Judge SENTELLE.
 
 SENTELLE, Circuit Judge:
 
 7
 Several local exchange companies engaged in the carriage of both intrastate and interstate telephone communications (collectively "carriers" or "petitioners") seek review of an order of the Federal Communications Commission ("FCC" or the "Commission") in which the Commission affirmed the validity of an intrastate ratemaking methodology employed by several states. Petitioners argue that the ratemaking methodology is, in essence, an unlawful method of "jurisdictional separation." Upon review, we have determined for the reasons set forth below that the state ratemaking methodology does not constitute an unlawful jurisdictional separation and, therefore, we affirm the order on review.[295 U.S.App.D.C. 399] I. BACKGROUND
 
 A. Jurisdictional Separations
 
 8
 The FCC has exclusive jurisdiction to regulate interstate common carrier services including the setting of rates. 47 U.S.C. §§ 151, 152(a) (1991). Conversely, the several states retain jurisdiction to regulate intrastate services including rates. 47 U.S.C. § 152(b)(1) (1991). See also North Carolina Utilities Commission v. FCC, 552 F.2d 1036 (4th Cir.), cert. denied, 434 U.S. 874, 98 S.Ct. 222, 223, 54 L.Ed.2d 154 (1977). The difficulty giving rise to the present controversy is that telephone carriers often use the same facilities to provide both intrastate and interstate service. The costs of these facilities, obviously significant components of the ratebase in each system, must be apportioned between the federal and state jurisdictions in order to "ensure[ ] the confinement of conflicting regulatory tribunals to their proper spheres." Illinois Bell Telephone Co. v. FCC, 883 F.2d 104, 114 n. 9 (D.C.Cir.1989). In 1930, the Supreme Court observed that because of "the difficulty in making an exact apportionment of the property ... extreme nicety is not required," but it did hold that "reasonable measures" are "essential." Smith v. Illinois Bell, 282 U.S. 133, 150, 51 S.Ct. 65, 69, 75 L.Ed. 255 (1930).
 
 
 9
 Four years after the Smith decision, Congress enacted § 221(c) of the Communications Act, which authorized the FCC to adjudge what portion of the carriers' property "shall be considered as used in interstate or foreign telephone toll service." 47 U.S.C. § 221(c). The Commission may adopt rules governing the apportionment of the costs between state and federal jurisdictions under a formal regulatory process known as "jurisdictional separation." See National Association of Regulatory Utility Commissioners v. FCC, 737 F.2d 1095, 1104-05 (D.C.Cir.1984) (NARUC ), cert. denied, 469 U.S. 1227, 105 S.Ct. 1224, 1225, 84 L.Ed.2d 364 (1985). Section 221(c) requires, inter alia, that "classification [of costs as either interstate or intrastate] shall be made after hearing, upon notice to the carrier, the State commission (or ... Governor ...) of any" affected state.
 
 
 10
 Significantly, for over thirty years following the enactment of § 221(c), the FCC did not adopt any formal jurisdictional separation methodology. Instead, it informally surveyed what was an essentially monopolistic industry to determine that interstate rates were just and reasonable in its view. In practice, the Commission, the state regulatory agencies, the then-unified American Telephone & Telegraph Company, and the few small independent companies informally negotiated jurisdictional separations despite the fact that the FCC was empowered to dictate a particular methodology. See Mid-Plains Telephone Company, Inc., Petition for Declaratory Ruling Regarding the Commission's Part 36 Separations Procedures, 5 F.C.C.R. 7050 (1990) (the "Mid-Plains Order ").
 
 
 11
 In 1969 the Commission for the first time endorsed a formal separation procedure under § 221(c). Prescription of Procedures for Separating and Allocating Plant Investment, Operating Expenses, Taxes, and Reserves Between the Intrastate and Interstate Operations of Telephone Companies, Report and Order, 16 F.C.C.2d 317 (1969). These procedures, with some subsequent amendments, prescribe accounting guidelines designed to attribute with some precision the costs utilities incur to their appropriate interstate or intrastate source. The Commission has codified this direct cost-based methodology at 47 C.F.R. Part 36 (1991).
 
 
 12
 In 1971 Congress revisited the Commission's jurisdictional separation authority and enacted legislation requiring it to follow certain procedures before adopting any separation methodology under § 221 in the future. Specifically, Congress provided that
 
 
 13
 [t]he Commission shall refer any proceeding regarding the jurisdictional separation of common carrier property and expenses between interstate and intrastate operations which it institutes pursuant to a notice of proposed rulemaking ... to a Federal-State Joint Board.
 
 
 14
 [295 U.S.App.D.C. 400] 47 U.S.C. § 410(c). Since 1971, the Commission has not utilized its authority under §§ 221(c) and 410(c) to adopt other separation methods, leaving Part 36 as the first and only formally approved set of rules.
 
 
 15
 We should note that the Part 36 cost-based separations rules do affect state ratemaking authority to the extent such rules apply to the telephone companies within their jurisdiction. See Hawaiian Telephone Company v. Public Utilities Commission of Hawaii, 827 F.2d 1264, 1275 (9th Cir.1987), cert. denied, 487 U.S. 1218, 108 S.Ct. 2870, 101 L.Ed.2d 906 (1988). Although each state has great freedom to regulate intrastate rates, once the FCC has applied its jurisdictional separation, that part of the cost base deemed to be interstate is outside the jurisdictional reach of the state regulatory agency. See, e.g., Smith, 282 U.S. at 159, 51 S.Ct. at 72.
 
 
 16
 B. Average Schedules and Residual Ratemaking
 
 
 17
 Although the Commission has formally adopted only the Part 36 cost-based jurisdictional separation method under § 221(c), it has nonetheless permitted some companies, including petitioners, to "estimate some or all of their costs through the use of an 'average schedule' which adopts generalized industry data to reflect the cost of a hypothetical exchange company" for purposes of figuring their interstate rates. NARUC, 737 F.2d at 1127. The "average schedule" allows companies to avoid the expense and effort of cost studies, and instead rely on industry-wide averages developed from information gathered by the National Exchange Carrier Association (NECA). Id.
 
 
 18
 This interstate ratemaking method has a significant impact on jurisdictional separations. Though average schedule ratemaking has never been formally adopted as a separation methodology, it does label a certain portion of total costs as interstate costs. Unsurprisingly, several states have come to rely on average schedules for their own intrastate ratemaking purposes. Just as the states subtract from the total cost base of a Part 36 carrier that part determined by FCC regulation to be interstate, many states deduct from the total cost base of an "average schedule" company that part attributed by the average schedule to interstate usage and treat the residuum as intrastate. This intrastate ratemaking method is known as "total company" or "residual" ratemaking. Put simply, a residual ratemaking state assumes that the intrastate revenue requirement is equal to the company's total revenue requirement less revenues deemed by the average schedule to be interstate.
 
 C. The Present Controversy
 
 19
 In 1989, Mid-Plains Telephone Company filed a petition with the FCC seeking an order declaring that Wisconsin's use of the residual ratemaking method constituted an unlawful jurisdictional separation. The FCC denied the petition in the order we now review, Mid-Plains Order, 5 F.C.C.R. 7050 (1990).
 
 
 20
 Petitioners now seek to overturn the Commission's order and ask us to hold that residual ratemaking is, at heart, not only an intrastate ratemaking scheme but a de facto jurisdictional separation methodology, not approved by the FCC pursuant to §§ 221(c) or 410(c), but simply thrust upon companies by the states. Worse still, petitioners contend, residual ratemaking plainly conflicts with the one formal separation method the FCC has adopted: the detailed cost-based methodology of Part 36.
 
 
 21
 Petitioners begin their attack on the validity of residual ratemaking with language from Smith, emphasizing that "[t]he separation of the intrastate and interstate property, revenues and expenses of" a carrier is not simply bookkeeping theory, but "essential to the appropriate recognition of the competent governmental authority in each field of regulation." 282 U.S. at 148, 51 S.Ct. at 68.
 
 
 22
 From Smith, petitioners turn to §§ 221(c) and 410(c) of the Act. The procedures codified there, they argue, provide the only acceptable manner in which the Commission may meet its obligations under Smith to identify interstate costs unavailable for state ratemaking. Petitioners [295 U.S.App.D.C. 401] then note that the only separation method adopted pursuant to these procedures is, of course, the cost-based method of Part 36.
 
 
 23
 Petitioners continue that with residual ratemaking states establish a de facto jurisdictional separation and do so in plain violation of statutory procedures. By deeming what will be recognized as intrastate costs--namely total company costs less the average schedule--residual ratemaking effectively allocates petitioners' costs between the federal and state spheres. This is done, petitioners emphasize, despite the fact that residual ratemaking has never been approved under either § 410(c) or § 221(c).
 
 
 24
 Petitioners further suggest that residual ratemaking and the separation methodology it embraces is not only different from, but in conflict with, the only properly adopted separations method. By relying on an average schedule, residual ratemaking only approximates actual intrastate costs, while Part 36 requires detailed cost studies which allow greater precision in figuring the proper intrastate ratemaking base. In sum, petitioners contend that with residual ratemaking states are simply substituting their own separation methodologies in lieu of the FCC-approved method.
 
 
 25
 Interestingly, petitioners' challenge in this case is limited to residual ratemaking. Nowhere do they claim that the use of average schedules on which residual ratemaking is based constitutes an illegitimate separation methodology. The result petitioners urge on us, then, is to continue allowing average schedules on the federal level, while insisting on cost-based studies at the state level. In common with Smith, this dispute is not simply a debate on bookkeeping theory. A short, admittedly oversimplified, hypothetical example will illustrate the importance of this case to carriers and ratemakers alike:
 
 Situation 1: Pure Cost Method
 
 26
 Suppose Carrier has total costs of $100; it has a right to recover these costs in rates set by appropriate authorities. It conducts a Part 36 cost study annually and ascertains that $25 of the $100 is due to interstate service, and, consequently, $75 to intrastate service. It is entitled to receive those sums from the appropriate customers under rates set by governmental authorities. There is no dispute. In sum:
 
 
 27
 Total Costs $100
Interstate Costs $ 25
Intrastate Costs $ 75
 ----
Total Allowed $100
 
 
 28
 * * * * * *
 
 Situation 2: Pure Averaging
 
 29
 Now suppose that Carrier chooses to go on the average schedule system for obtaining its interstate payments. Its true costs are still the same as above. Yet, suppose the average schedule allows $35 for interstate service. Residual ratemaking by the states would simply take Carrier's total costs ($100) and subtract the amount recovered from the average schedule ($35) and, thus, allow Carrier to recover $65 in intrastate charges.
 
 
 30
 Total Costs $100
Interstate Average $ 35
Residual Costs $ 65
 ----
Total Allowed $100
 
 
 31
 Carriers argue that by allowing only $65 in intrastate recovery--by reducing the amount allowed by $10 because of the use of the average schedule--states are really taking jurisdiction over revenues actually flowing from interstate commerce (as ascertained by the Part 36 cost method analysis) and, thus, overstepping their jurisdictional bounds.
 
 
 32
 * * * * * *
 
 
 33
 Situation 3: Mixing Average Schedules and Cost Methods
 
 
 34
 Petitioners seek to use the average schedule on the federal level while employing the cost method on the state level allowing Carrier more cost basis in total ratemaking than its actual costs:
 
 
 35
 Total Costs $100
Interstate Average $ 35
Intrastate Costs $ 75
 ----
Total Allowed $110
 
 
 36
 Thus, if we allow the present petition, a carrier using the average schedule to calculate [295 U.S.App.D.C. 402] costs of interstate service but determining actual costs for intrastate ratemaking could be provided with a total base for rate calculation exceeding 100 percent of its costs.
 
 II. ANALYSIS
 A. The Permissive Character of § 221(c)
 
 37
 In our view, petitioners' step-by-step argument from Smith, through §§ 221(c) and 410(c), and finally Part 36, does not inexorably lead to their conclusion that residual ratemaking is an impermissible jurisdictional separation. To the contrary, we find their argument flawed from the start, conflating constitutional admonitions with statutory requirements, and overstating the breadth of those statutory mandates.
 
 
 38
 Congress in enacting § 410(c) was undoubtedly responding to the Smith decision compelling an allocation between interstate and intrastate costs. Though Smith did not delineate the outer limits of congressional regulatory power under the Commerce Clause, Article I, § 8, cl. 3, it did remind us that a federal commission's power to regulate, deriving from Congress, is "to pass upon the rates, charges, and practices relating to [interstate] service." Smith, 282 U.S. at 149, 51 S.Ct. at 69. Under the Smith analysis, any attempt to impose intrastate rates is beyond federal authority; conversely, states may not trench upon interstate matters. It is true that more recent developments in the jurisprudence of the Commerce Clause might support a more expansive view of Congress's power to regulate intrastate rates. For example, the Supreme Court has stated that " 'even activity that is purely intrastate in character may be regulated by Congress, where the activity, combined with like conduct by others similarly situated affects commerce among the states or with foreign nations.' " Hodel v. Virginia Surface Mining and Reclamation Association, 452 U.S. 264, 277, 101 S.Ct. 2352, 2360, 69 L.Ed.2d 1 (1981) (quoting Fry v. United States, 421 U.S. 542, 547, 95 S.Ct. 1792, 1795, 44 L.Ed.2d 363 (1975)). Nonetheless, the Congress that enacted the Communications Act was regulating in response to Smith, and no intervening Congress has seen fit to depart from the decision that some form of separation is to remain, whether or not constitutionally required.
 
 
 39
 Petitioners rush from Smith to § 410(c) of the Act. They seemingly suggest that the procedures outlined there are the only acceptable means of ensuring compliance with Smith 's dictates. This cannot succeed as a constitutional proposition. This limited clause of a discrete congressional act does not purport to define the contours of the Commerce Clause. The convocation of a "Federal-State" board surely is not a prerequisite to the protection of the separate spheres of sovereignty belonging to the federal government and the several states.
 
 
 40
 What petitioners really mean to suggest, we believe, is that § 410(c) is the only means Congress has statutorily permitted the FCC to utilize in achieving the Smith allocation. However, even this less ambitious argument must fail, as it depends on a faulty reading of the Commission's obligations under the Act. To begin, the procedural requirements embodied in § 410(c) are triggered only by a jurisdictional separation "which [the Commission] institutes pursuant to a notice of proposed rulemaking." In the present case, of course, the FCC has begun no rulemaking process to adopt residual ratemaking as a separation methodology. Thus, the plain language of the section suggests its own inapplicability.
 
 
 41
 This answer obviously leads us to other questions. Was the Commission free under the Act to avoid instituting § 410(c) procedures as it did here? Did Congress grant it such discretion or is there a statutory hook upon which this Court could compel regulatory action? Section 410(c) itself is of no help in addressing these concerns: it provides only the rubric under which the Commission must operate once proceedings have begun; nowhere does it indicate how proceedings are initiated.
 
 
 42
 Petitioners point us to § 221(c), insisting that we can find there a statutory requirement that the FCC institute formal separation procedures and do so only after complying [295 U.S.App.D.C. 403] in full with the mandates of § 410(c). Section 221(c) provides that
 
 
 43
 the Commission may classify the property of any such carrier used for wire telephone communication, and determine what property of said carrier shall be considered as used in interstate or foreign telephone toll service. Such classification shall be made after hearing, upon notice to the carrier, the State commission (or the Governor ...) of any State in which the property ... is located.
 
 
 44
 47 U.S.C. § 221(c) (emphasis added). Petitioners contend that § 221(c) mandates the use of § 410(c) procedures in any jurisdictional separation, and that, taken together with § 410(c), or even viewed separately, renders residual ratemaking an invalid jurisdictional separation.
 
 
 45
 Petitioners overstate the section's requirements, however. Section 221(c) itself states only that the Commission "may" institute formal proceedings for the adoption of separation methodologies, not that it "shall." As we have noted before, "the usual presumption [is] that 'may' confers discretion, while 'shall' imposes an obligation to act." International Union, UAW v. Dole, 919 F.2d 753, 756 (D.C.Cir.1990) (citing Haig v. Agee, 453 U.S. 280, 294, 101 S.Ct. 2766, 2775, 69 L.Ed.2d 640 n. 26 (1981)).
 
 
 46
 Granted, § 221(c) goes on to provide that "such classification shall be made after" certain procedural requirements are undertaken. However, this obligatory "shall" is dependent upon the discretionary "may" of the first clause. That is, if--but only if--the Commission decides in its discretion to pursue a jurisdictional separation under § 221(c), then it must do so in compliance with § 221(c) procedures and presumably those in § 410(c). No procedural requirements are triggered absent the Commission's discretionary choice to adopt a new formal separation guideline.
 
 
 47
 At this juncture, petitioners might rightly point to our decisions which state that "the ordinarily discretionary overtone of the word 'may' 'can be defeated by indications of legislative intent to the contrary or by obvious inferences from the structure and purpose of the statute.' " International Union v. Dole, 919 F.2d at 756-57 (quoting United States v. Rodgers, 461 U.S. 677, 706, 103 S.Ct. 2132, 2149, 76 L.Ed.2d 236 (1983)). This case, however, does not involve such an exception. In the first place, the use of "may" and "shall" in the same sentence of § 221 argues for the usual construction of each word. In International Union v. Dole, we held that the use of the two words in the same section made it especially likely that Congress actually meant what it said. 919 F.2d at 756-57. See also Hecht Co. v. Bowles, 321 U.S. 321, 326-27, 64 S.Ct. 587, 590, 88 L.Ed. 754 (1944) (holding that the use of "may" and "shall" in the same sentence of the statute implies that each was used purposefully); Persinger v. Islamic Republic of Iran, 729 F.2d 835, 843 (D.C.Cir.), cert. denied, 469 U.S. 881, 105 S.Ct. 247, 83 L.Ed.2d 185 (1984) (the use of different language in different parts of the same statute creates a strong inference that different meanings are intended).
 
 
 48
 Further, the history of practice under the Communications Act supports this view. For four years after Smith recognized the need for some form of allocation of costs between interstate and intrastate uses, the Interstate Commerce Commission (the "ICC")--then vested with the authority to regulate interstate communications--allocated costs without any statutorily prescribed procedures at all. The ICC simply allocated costs informally. Even after the enactment of the Communications Act in 1934, and the vesting of regulatory power over interstate communications in the FCC, no formal statutory jurisdictional separation was adopted for over thirty years. The Commission simply allocated costs informally--this despite the existence of § 221(c). Petitioners have shown us no evidence that the state commissions, the FCC itself, or the courts ever found any error in the FCC's use of informal negotiations to achieve the functional equivalent of the unused statutory jurisdictional separation during that long span.
 
 
 49
 We recognize the possibility that the Commission may have misconstrued its responsibilities [295 U.S.App.D.C. 404] under the statute for some three decades. We do not, however, recognize this as a probability, particularly as we have been informed by Chevron U.S.A. Inc. v. NRDC, 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1983), that
 
 
 50
 if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.
 
 
 51
 If any ambiguity exists in the term "may" of § 221(c)--and this is petitioners' strongest argument--then the Commission's interpretation that the "may" is indeed discretionary, being consistent with now 58 years of agency practice, and with the most natural reading of the express wording of the statute, seems at least "permissible."
 
 
 52
 Lest we hide our holding in verbiage, we summarize. Smith v. Illinois Bell recognized a constitutional necessity for distinguishing between the jurisdiction of interstate and intrastate regulators. The Communications Act, specifically 47 U.S.C. §§ 221(c) and 410(c), provided a method of achieving that separation. Those statutory procedures are mandatory when the Commission chooses to adopt a formal separations methodology. Nonetheless, when the Commission divides the regulated area with the states without resort to the statutory formality, then employment of the statutory method is not, by its own terms, mandatory.
 
 B. Petitioners' Discrete Objections
 
 53
 In addition to the sweeping argument that §§ 221(c) and 410(c) totally control the universe of possible separation methodologies, petitioners attack the FCC's acquiescence in residual ratemaking on more specific bases. They assert that the Commission has indulged in an arbitrary and capricious inconsistency with its own prior regulation and policies regarding the purpose of interstate averaging. As the petitioners view the average schedule, its rationale is to encourage efficiency by allowing average schedule companies to realize additional revenues by " 'beating the average'--i.e., by keeping their costs below average." Brief of Petitioners at 30. That is, in petitioners' view, the overrecovery of costs shown in our simplified example above is appropriate, because the Commission designed the average schedule to encourage efficiency. Residual ratemaking defeats that overrecovery, and therefore deprives the company of the incentive for efficient operation intended by the Commission.
 
 
 54
 Petitioners' argument is not without appeal. It is true that the Commission has asserted the economic incentive of "retain[ing] the benefits that accrue from increases in productivity and reductions in expenditures" as a rationale underlying average schedule treatment of carriers. In the Matter of Policy and Rule Concerning Rates for Dominant Carriers, 5 F.C.C.R. 6786, 6820 (1990). Thus, it cannot be gainsaid that petitioners have found some partial inconsistency between the Commission's allowance of residual ratemaking and its policy of encouraging cost containment. That calculation does deprive carriers of the full benefit available under a mixed system, a benefit previously described by the Commission as a reason for the use of average schedules.
 
 
 55
 This, however, is not the end of the story. In the first place, the incentive discussion quoted from the FCC proceeding is not the sole rationale for average scheduling. As the Commission stated in the Mid-Plains Order, this Court "has consistently noted that the Commission's purpose for allowing the use of average schedules is to avoid imposing the costly burden of developing jurisdictionally separated cost studies upon small [local exchange carriers]." 5 F.C.C.R. at 7053-54 (citing NARUC, supra, and ALLTEL Corp. v. FCC, 838 F.2d 551 (D.C.Cir.1988)). This cost rationale, of course, is in no way inconsistent with using residual ratemaking.
 
 
 56
 Admittedly, it is also true that we have in the past rejected some of the Commission's reasoning founded on the cost rationale. In NARUC, we remanded the Commission's order allowing average scheduling because the Commission had not adequately [295 U.S.App.D.C. 405] justified its distinction between unaffiliated companies eligible for average schedule participation and otherwise similarly situated companies rendered ineligible by their affiliation with larger corporate entities. 737 F.2d at 1128. In ALLTEL, after the NARUC remand, we concluded that the Commission's further explanation for the same discrimination on remand did not solve the problem. Most significantly for the present controversy, we did so in part because the Commission's own rationale had pointed out that " 'reasonable costs of interstate studies for average schedule companies that convert to cost company treatment are fully compensable from interstate ratepayers as allowable expenses.' " ALLTEL, 838 F.2d at 559 (quoting MTS and WATS Market Structure, Memorandum Opinion and Order, 3 F.C.C.R. 834, 836 (1986)). While these cases call into question some degree of the Commission's reliance on the cost rationale for average schedule ratemaking, they do not destroy that rationale. More importantly for present purposes, they do not compel the adoption of the pure economic incentive advanced by petitioners as the sole rationale.
 
 
 57
 The fact we noted in ALLTEL that a Part 36 jurisdictional separation can impose more costs on a company than average schedule ratemaking and that these costs are fully recoverable in appropriately set rates does not mean that the cost-based rationale is unavailable. It is still perfectly possible to justify the use of average schedules on a cost-saving basis. It is not irrational for the Commission to permit or create a ratemaking device--in this case the average schedule--which reduces costs, with the cost reduction being passed along to the customers. Neither would this necessarily destroy all the economic incentives advanced by petitioners. For example, it is not a given that the interplay between differing times of computation and differing rates of return recognized by state and federal regulators will not still result in significant economic incentives for carriers to "beat the average." Also, a reduction in cost passed to the consumer may well result in increased trade for the carrier. That is, if telephone calls are cheaper on a carrier's system, conventional understandings of economic theory would suggest that consumers may purchase more of the cheaper service, thus presumably benefitting the efficient carrier.
 
 
 58
 Finally, and perhaps most importantly, the erosion of rationale worked by inconsistency goes as much to average schedule ratemaking in toto as to residual ratemaking. But petitioners have not challenged the average schedule scheme itself. Until the day that they or someone else does, we accept the Commission's reliance on its policy pronouncement that "[n]o company has a legal or equitable right to obtain more than its full costs," MTS and WATS Market Structure Average Schedule Companies, 103 F.C.C.2d 1017, 1027 (1986), but recognize the legitimacy of petitioners' complaint that this is difficult to square with the above-quoted language concerning the economic incentives to the carriers of "retaining the benefits."
 
 
 59
 Again, the Commission may have some powerful explaining to do if the average schedules concept again comes before us, but it has not yet. Petitioners ask us only to strike the Commission's ruling as to what the states can do with the cost residuum after the average schedule has been applied. Insofar as the cost basis underlies average schedule ratemaking, there is no inconsistency in allowing the states to base their rates on the same relatively inexpensive method of computing the facility component of ratebase that the federal regulator uses. Insofar as the incentive rationale underlies average schedule ratemaking, if it is to petitioners' advantage, they may wish in the future to bring the whole question of average schedule ratemaking before this Court. The present petition does not do so. To call residual ratemaking a jurisdictional separation does not carry petitioners across this stile. If a jurisdictional separation has occurred, it would now seem that it occurred when the Commission applied the average schedule, not when the state regulated the residue.
 
 
 60
 Whether or not called a "jurisdictional separation," under the Smith analysis as [295 U.S.App.D.C. 406] adopted by Congress there must be some determination by which the federal regulator computes rates based on the carrier's property apportioned to interstate usage and the state regulator conducts ratemaking based on that portion allocated to intrastate usage. Mid-Plains was certainly not frivolous in raising before the Commission the question of when that determination occurred. Given the Commission's loose language on incentives, it was far from totally absurd to assert that Part 36 still governed the jurisdictional separation and that the Commission, by allowing the use of average schedules, had simply chosen to base its rates on something other than the costs allocated under that jurisdictional separation. Neither, however, was it frivolous of the states to view the average schedule computation as an informal jurisdictional separation complying with Smith and paralleling the old negotiated separations. The Commission has now let us know that the states, not the companies, read it rightly. In denying the petition to review the Commission's pronouncement, we persist in our view that the use of total company ratemaking is no more inconsistent with the statutory requisites for formal ratemaking than was the negotiated nonstatutory base allocation of the decades between the passage of the Act and the first formal jurisdictional separation.
 
 
 61
 Next, petitioners argue that the Commission's failure to strike down residual ratemaking is inconsistent with the teachings of Hawaiian Telephone. There the Ninth Circuit found a Hawaiian ratemaking method to be a thinly disguised separation methodology, one in direct conflict with Part 36. 827 F.2d at 1275-76. Consequently, it struck down the state regulation as preempted by the federal methodology. Id. From this case petitioners draw the conclusion that Part 36 preempts any and all state ratemaking methodologies not based on a Part 36 separation.
 
 
 62
 In our view, however, petitioners take an unwarranted leap from Hawaiian Telephone's actual holdings to their own conclusions. Hawaiian Telephone merely instructs that when the Commission has prescribed an applicable separation methodology, states are not free to ignore it. The case does not purport to cover the situation before us where the FCC has not established formal separation rules for average schedule companies. Thus, we agree that states must abide by all applicable formal separation rules, but this truism has no relevance to a scenario in which no such formal rules exist and the Commission itself agrees that the states' actions are consistent with its substitute method of cost allocation.
 
 
 63
 Petitioners finally rely on Louisiana Public Service Commission v. FCC, 476 U.S. 355, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986). There the Supreme Court found that the FCC erred when it declared that its own rules governing depreciation of telephone plants preempted inconsistent decisions by state regulatory authorities. The Supreme Court, in sum, found that the FCC had trampled upon intrastate issues properly belonging to the states. Here, petitioners argue, the FCC has failed not by improperly preempting state action, but by failing to preempt an area "which Congress, by codifying the Supreme Court's decision in Smith, clearly has placed outside the reach of state jurisdiction." Petitioner's Reply Brief at 9.
 
 
 64
 This reliance is ill-placed for two reasons. First, petitioners depend not on the Court's actual holding in Louisiana, but its inverse, a proposition without precedent: that the FCC erred here by not preempting state authority. Second, they use it merely to refit an old argument rather than to make a new one. They contend again that the FCC must preempt residual ratemaking on the theory that §§ 221(c) and 410(c) are the only acceptable means of satisfying Smith 's requirement that neither sovereign, state nor federal, interfere in the other's regulatory regime. But, this is simply not so, as we have discussed above and will not repeat here in any detail. Sections 221(c) and 410(c) are not codifications of Smith, but suggest only one means in which Smith may be satisfied.
 
 III. CONCLUSION
 
 65
 In sum, we conclude that the statutory procedures promulgating a jurisdictional [295 U.S.App.D.C. 407] separation methodology are not the exclusive means by which state and federal areas of regulation may be delineated. The alternate method represented by average schedule interstate cost calculation, in conjunction with residual intrastate calculation, does not violate the Communications Act. The power of the state to employ the residual method is not preempted by federal regulation. The petition for review is
 
 
 66
 Denied.