In re Appeal of Investigation into Existing Rates of Shoreham Telephone
 Co., Inc. (2005-077)

2006 VT 124

[Filed 17-Nov-2006]


 NOTICE: This opinion is subject to motions for reargument under
 V.R.A.P. 40 as well as formal revision before publication in the Vermont
 Reports. Readers are requested to notify the Reporter of Decisions,
 Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801 of
 any errors in order that corrections may be made before this opinion goes
 to press.


 2006 VT 124

 No. 2005-077


 In re Appeal of Investigation into Supreme Court
 Existing Rates of Shoreham 
 Telephone Company, Inc.
 On Appeal from
 Public Service Board

 January Term, 2006

 Michael H. Dworkin, Chair

 Paul J. Phillips and Elijah D. Emerson of Primmer & Piper, P.C., St.
 Johnsbury, for Appellant.

 June E. Tierney, Department of Public Service, Montpelier, for Appellee.


 PRESENT: Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.


 ¶ 1. REIBER, C.J. Shoreham Telephone Company, Inc. appeals from
 a Public Service Board order requiring that it reduce its revenues from
 intrastate telephone service by over $1.2 million. Shoreham contends: (1)
 the Board violated state and federal law by employing a methodology that
 impermissibly uses interstate revenues to subsidize intrastate rates; (2)
 the order will produce intrastate rates that are confiscatory; (3) the
 Board's disallowance of income tax expense from Shoreham's intrastate cost
 of service is unsupported by the evidence, unjust, and unreasonable; and
 (4) the order to establish a liability account for Shoreham's accumulated
 deferred income taxes (ADIT) was improper. We affirm.
 
 ¶ 2. Shoreham is a small telecommunications company that
 provides telephone services to approximately 3700 customers in several
 towns in Addison County. After reviewing Shoreham's 2002 supplemental
 financial reports, the Board found that there was "a significant
 possibility that Shoreham's intrastate revenues are higher than a just and
 reasonable level." Accordingly, the Board opened an investigation into
 Shoreham's existing rates and related issues, including the "benefits (and
 costs) of establishing Shoreham's rates using a total company (or residual)
 methodology." See 30 V.S.A. § 227(b) (Board may order investigation into
 justness and reasonableness of rates). The Department of Public Service
 participated in the proceedings as public advocate. Id. § 217 (Department
 of Public Service, through the Director of Public Advocacy, shall represent
 the public at hearings on rates).

 ¶ 3. Following the submission of substantial prefiled testimony by
 both parties and three days of technical hearings, the hearing officer
 filed a proposal for decision in August 2004 containing extensive findings
 and recommendations. Critical among these were his findings that in 2002
 Shoreham's net profit of $1.2 million resulted in an overall rate of return
 of 38.8%, well in excess of industry standards; that application of a
 "total company" or "residual ratemaking" methodology would ensure that
 Shoreham - an "average schedule" company since 1982 - received no more than
 100% of its intrastate costs, plus a reasonable rate of return; that
 Shoreham is a Sub-chapter S corporation which pays no direct income tax,
 and therefore should reduce its expenses attributed to income taxes; and,
 finally, that Shoreham should be required to establish a regulatory
 liability account equal to the difference between its current ADIT balance
 of $611,143 and the ADIT balance that would have been produced had Shoreham
 been taxed at the actual corporate income tax rate since 1999. In total,
 the hearing officer recommended that Shoreham's intrastate rates be
 adjusted to reduce its intrastate income by $1,126,725. 
 
 ¶ 4. In November 2004, the Board issued its ruling adopting the
 proposed decision largely in its entirety, subject to several specific
 modifications, including a total elimination of the income tax expense from
 the calculation of Shoreham's legitimate expenses. This resulted in a
 required reduction of $1,268,459 from Shoreham's intrastate rates. The
 Board authorized Shoreham to reduce its intrastate rates in three equal
 stages over a seventeen-month period, and allowed it either to keep the new
 regulatory account on its books until the liability for which it was
 collected occurred or return it to taxpayers in the form of amortizations
 over a reasonable period of time. In response to Shoreham's subsequent
 motion to alter or amend, the Board modified its decision in several
 relatively minor respects, but otherwise denied the motion. This appeal
 followed. 

 I.


 ¶ 5. A brief review of the regulatory backdrop is essential to a
 proper resolution of Shoreham's several claims on appeal. Shoreham is a
 local exchange carrier (LEC) under state and federal law, subject to
 separate regulation by the state and federal governments. See Crockett
 Tel. Co. v. FCC, 963 F.2d 1564, 1566 (D.C. Cir. 1992) (reviewing historical
 basis of federal regulation of interstate common carrier services and state
 regulation of intrastate services). The Federal Communications Commission
 (FCC) regulates interstate and foreign telecommunications services, while
 states retain jurisdiction to regulate intrastate services. 47 U.S.C. §§
 151, 152(b). In Vermont, the Board exercises local jurisdiction to ensure
 that Shoreham's intrastate rates are "just and reasonable." 30 V.S.A. §
 218. 
 
 ¶ 6. To implement this dual scheme of regulation, "a utility's
 'revenues, investment, and expenses must be apportioned between the
 interstate and intrastate jurisdictions.' " Pine Tree Tel. & Tel. Co. v.
 Pub. Utils. Comm'n, 631 A.2d 57, 62 (Me. 1993) (quoting Mid-Plains Tel.
 Co., 5 F.C.C.R. 7050, 7050 (1990)), aff'd sub nom. Crockett Tel. & Tel.
 Co.v. FCC, 963 F.2d 1564 (D.C. Cir. 1992). This process of apportionment
 is known as jurisdictional separation. Crockett, 963 F.2d at 1566; see
 Smith v. Illinois Bell Tel. Co., 282 U.S. 133, 148, 150 (1930) (holding
 that "reasonable measures" of separations are "essential to the appropriate
 recognition of the competent governmental authority in each field of
 regulation"). Four years after the decision in Smith, Congress authorized
 the FCC to classify carriers' costs as interstate or intrastate for
 purposes of federal regulation, 47 U.S.C. § 221(c), and the FCC eventually
 codified a formal, nonexclusive, cost-based separation procedure at 47
 C.F.R. pt. 36 (1991). See Crockett, 963 F.2d at 1566-67 (holding that
 federal recognition of the cost-based ratemaking and separations procedure
 was not intended to exclude other methodologies). 

 ¶ 7. From its inception, the separations requirement was recognized
 by the United States Supreme Court to be a costly, complex, and necessarily
 inexact process, in part because in many cases the equipment and plant used
 to provide intrastate service is also used to provide interstate service. 
 See Smith, 282 U.S. at 150 (observing that while separation is essential,
 because of "the difficulty in making an exact apportionment of the property
 . . . extreme nicety is not required"); accord La. Pub. Serv. Comm'n v.
 FCC, 476 U.S. 355, 360 (1986) ("[W]hile the [Communications] Act would seem
 to divide the world of domestic telephone service neatly into two
 hemispheres . . . in practice, the realities of technology and economics
 belie such a clean parceling of responsibility."). 
 
 ¶ 8. To save companies the often substantial expense and effort of
 preparing expert cost studies, the FCC has for many years permitted some
 smaller carriers to derive their interstate costs from an "average
 schedule," essentially an estimate based on general industry data
 approximating the costs of a similarly situated hypothetical exchange
 company. (FN1) See Crockett, 963 F.2d at 1567 (discussing the history and
 methodology underlying use of average schedules); Nat'l Ass'n of Regulatory
 Util. Comm'rs v. FCC, 737 F.2d 1095, 1127 (D.C. Cir. 1984), cert. denied,
 469 U.S. 1227 (1985) (same); Pine Tree, 631 A.2d at 62-63 (same). The FCC
 categorizes LECs as either "cost-based" or "average-schedule" companies for
 purposes of compensating them for their federal jurisdictional costs from
 an overall interstate "settlement pool." A cost-based company tracks and
 reports its interstate costs based on its actual costs. An
 average-schedule company does not track or report its actual interstate
 costs, but instead recovers its estimated interstate costs based on the
 average schedule. (FN2)
 
 ¶ 9. Because the average-schedule system used by federal regulators
 conveniently designates a certain portion of a carrier's overall costs as
 interstate, "[u]nsuprisingly, several states have come to rely on average
 schedules for their own intrastate ratemaking purposes." Crockett, 963
 F.2d at 1567. Just as many states have subtracted from a cost-based
 carrier's total costs its actual interstate costs in order to derive from
 the remainder its intrastate costs, so a number of states deduct from the
 total cost base of an average-schedule carrier that portion attributed by
 the average schedule to interstate usage, "and treat the residuum as
 intrastate." Id.; see also Pine Tree, 631 A.2d at 63 (explaining that
 "some state regulators simply subtract these [average-schedule] interstate
 costs from the company's total costs and treat the residuum as intrastate
 costs"). This intrastate ratemaking method is known as "total company" or
 "residual ratemaking." Crockett, 963 F.2d at 1567. 

 ¶ 10. The residual-ratemaking process, in the context of an
 average-schedule company, has been described as follows: 

 [First], the commission determines a reasonable level of expense
 and a reasonable return on the net investment rate base for the
 total company. The commission then deducts the amount of average
 schedule payments from the total company revenue requirement to
 determine the intrastate portion of the total company revenue
 requirement. Intrastate rates are then established to recover
 this residual amount.

 Pine Tree, 631 A.2d at 63 (quotation omitted). Thus, state regulators
 using residual ratemaking-like the Board here-assume that the intrastate
 revenue requirement is equal to the company's total revenue requirement
 less revenue deemed by the average schedule to be interstate. Id. 

 ¶ 11. As the Crockett court noted, the residual-ratemaking method
 "has a significant impact on jurisdictional separations." 963 F.2d at
 1567. While an average-schedule company that uses the cost-based method
 might enjoy a recovery in excess of its total revenue requirements (when
 the average federal "settlement" exceeds the company's actual interstate
 costs), the use of residual-ratemaking generally "will guarantee 100%
 recovery, no more, no less." Pine Tree, 631 A.2d at 64 (quotation
 omitted); see also Crockett, 963 F.2d at 1568-69 (illustrating how "a
 carrier using the average schedule to calculate costs of interstate service
 but determining actual costs for intrastate ratemaking could be provided
 with a total base for rate calculation exceeding 100 percent of its
 costs"). 
 
 ¶ 12. In the seminal Crockett decision, a federal appeals court
 upheld the use of residual ratemaking as a lawful separations methodology
 against a challenge brought by several LECs. The court readily
 acknowledged that, "[b]y relying on an average schedule, residual
 ratemaking only approximates actual interstate costs, while Part 36 [the
 FCC approved cost-based method] requires detailed cost studies which allow
 greater precision in figuring the proper intrastate ratemaking base."
 Crockett, 963 F.2d at 1568. Nevertheless, the court rejected the LECs'
 claims that Congress had preempted the field by approving the use of actual
 cost-based ratemaking, holding-to the contrary-that states remain free to
 employ other methodologies, including residual ratemaking, as a means to
 comply with the Supreme Court's constitutional admonition in Smith for
 jurisdictional separation. Crockett, 963 F.2d at 1573-74.

 ¶ 13. The use of residual ratemaking received further approval from
 the Maine Supreme Judicial Court in Pine Tree. There, as here, a small
 telephone company challenged the state utility commission's use of the
 total-company method to determine the carrier's intrastate rates. Pine
 Tree, 631 A.2d at 62. The company asserted, among other claims, that the
 method "use[s] revenues generated from interstate customers to benefit
 intrastate customers violat[ing] the . . . prohibition against
 cross-subsidization." Id. at 66 (quotation omitted). The argument rested
 on the fundamental principle, dating from as early as Smyth v. Ames, 169
 U.S. 466 (1898), that one class of customers should be neither burdened by
 the losses nor benefitted by the profits generated in connection with
 services accorded a different class of customers. See El Paso Elec. Co. v.
 Fed. Energy Reg. Comm'n, 667 F.2d 462, 468 (5th Cir. 1982) (reviewing
 history and rationale of principle that "with respect to ratemaking, each
 jurisdiction or class of customers should pay its own way"). The rule
 against "cross-subsidization"-essentially a corollary to the preemption
 principle that states may not intrude upon areas, such as interstate
 commerce, regulated by the federal government-promotes the jurisdictional
 separation essential to regulatory ratemaking. Id.
 
 ¶ 14. The Maine court rejected the cross-subsidization claim,
 distinguishing its earlier decision in Maine Water Co. v. Public Utility
 Commission, 482 A.2d 443 (Me. 1984), where it found that the utilities
 commission had improperly attempted a "dollar-for-dollar flow[-]through" of
 gains from one division to another. Pine Tree, 631 A.2d at 66. The case
 before it was more akin to Millinocket Water Co. v. Public Utility
 Commission, 515 A.2d 749 (Me. 1986), where the commission had used a
 "[c]ompany's parent as proxy for determining the cost of equity and did not
 attempt to effectuate a flow-through." Pine Tree, 631 A.2d at 66 (internal
 quotation omitted). The court in Pine Tree thus concluded that, in
 employing residual ratemaking, "the commission relied on average schedules
 as a proxy to determine Pine Tree's interstate costs and did not attempt to
 effect a flow-through of gains from Pine Tree's interstate activities to
 subsidize its intrastate activities." Id. Accordingly, it found no
 violation of the separations principle.

 ¶ 15. With this regulatory background in mind we turn to Shoreham's
 principal claim that the Board erroneously relied on residual ratemaking in
 violation of state and federal law. As noted, Shoreham has been an
 average-schedule company since 1982, recovering its interstate costs based
 on the FCC-approved generalized industry average, and thereby avoiding the
 significant administrative burden and expense of tracking its actual 
 costs. Nevertheless, Shoreham argued below, and renews its claim here,
 that the Board was prohibited from employing the average schedule under the
 residual ratemaking method. Shoreham urged reliance, instead, on a "proxy"
 cost study that it had commissioned which purported to show that its
 intrastate revenues were deficient by $168,028. The Board declined,
 finding that the proxy study relied upon calculations that "appear to be
 inconsistent with the FCC's [jurisdictional separations regulations] and
 [the National Exchange Carrier Association's] guidelines" causing its
 "accuracy and appropriateness" to be "questionable."
 
 ¶ 16. The Board opted, instead, to apply the residual ratemaking
 method, noting that Shoreham's choice to remain an average-schedule
 company had allowed it to enjoy an excessive recovery, with intrastate
 customers paying for the same plant and operations that Shoreham was
 already being compensated for through interstate rates. Applying residual
 ratemaking, the Board concluded, would ensure that intrastate rates are
 just and reasonable, and would limit Shoreham's recovery to 100% of its
 total revenue requirements. The result, as noted, was an order requiring
 Shoreham to reduce its intrastate revenues by $1,237,143, to $822,404.

 ¶ 17. Orders of the Board enjoy a strong presumption of validity. 
 In re Green Mountain Power Corp., 162 Vt. 378, 380, 648 A.2d 374, 376
 (1994). Where the Board exercises ratemaking authority, we afford
 substantial deference to its decisions so long as the Board's actions "are
 directed at proper regulatory objectives." In re Green Mountain Power
 Corp., 142 Vt. 373, 380, 455 A.2d 823, 825 (1983). In recognition of the
 complexities of utility regulation, we defer to the Board's particular
 expertise in ratemaking and assume a limited role in the process. In re
 Cent. Vt. Pub. Serv. Corp., 141 Vt. 284, 288, 449 A.2d 904, 907 (1982). 
 Thus, we accept the Board's findings and conclusions that are not clearly
 erroneous, In re Vermont Telephone Co., 169 Vt. 476, 481, 739 A.2d 671,
 674-75 (1999), and in reviewing those findings "we give great deference to
 the particular expertise and informed judgment of the Board." In re E.
 Georgia Cogeneration Ltd. P'ship, 158 Vt. 525, 531, 614 A.2d 799, 803
 (1992). 

 ¶ 18. With this highly deferential standard in mind, we can find no
 basis to disturb the Board's considered judgment that use of the residual
 ratemaking methodology in this case yielded a just and reasonable
 intrastate rate consistent with federal law. As the Board succinctly yet
 comprehensively explained, residual ratemaking merely

 accepts the interstate/intrastate cost separation factors that are
 inherent in the "average schedule" interstate rates. The
 methodology then applies the FCC's allowed 11.25% return on equity
 to these interstate cost allocations, thus assuring that Shoreham
 has a fair opportunity to recover its interstate costs. It also
 uses an intrastate return rate that we establish for determining a
 return on intrastate investment, and then employs a weighted
 average of the interstate and intrastate returns in conjunction
 with the total regulated ratebase and expenses of Shoreham to
 produce a revenue requirement for the Company as a whole. 
 Thereafter, the methodology simply derives the state share of
 revenues by subtracting interstate revenues (which are based upon
 the average schedule allocations plus the FCC-determined return)
 from the total. Under this approach, Shoreham has a reasonable
 opportunity to earn its authorized return on equity (or exceed it)
 in the interstate jurisdiction because the Board simply accepts
 the FCC's allocations and return on equity. Similarly, Shoreham
 can earn a fair return on its intrastate investment (as determined
 using the implied "average schedule" separations factors).

 Shoreham's vigorous claims to the contrary notwithstanding, we are not
 persuaded that the Board erred in rejecting its assertion that residual
 ratemaking effects an impermissible shift or reclassification of interstate
 revenues for intrastate purposes. As the Board found, the methodology is
 premised precisely on the separations requirement. It merely takes
 advantage of the simplicity of the average-schedule cost allocation-which
 Shoreham has retained for over twenty years for interstate cost
 purposes-for use in intrastate ratemaking.
 
 ¶ 19. Furthermore, as noted earlier, courts that have addressed
 residual ratemaking have determined that it is a sound methodology which
 does not impermissibly intrude into federal jurisdiction. "Insofar as the
 cost basis underlies average schedule ratemaking, there is no inconsistency
 in allowing the states to base their rates on the same relatively
 inexpensive method of computing the facility component of ratebase that the
 federal regulator uses," and it is reasonable for states to "view the
 average schedule computation as an informal jurisdictional separation" that
 complies with the jurisdictional restraints on states. Crockett, 963 F.2d
 at 1572-73 (holding that residual ratemaking is not preempted by the
 Communications Act). Nor, as Pine Tree explained, did the Board's reliance
 on the average-schedule settlement impermissibly attempt to cross-subsidize
 ratepayers. See 631 A.2d at 66 (concluding that the utility commission had
 properly "relied on average schedules as a proxy to determine Pine Tree's
 interstate cost and did not attempt to effect a flow-through of gains from
 Pine Tree's interstate activities to subsidize its intrastate rates"). 

 ¶ 20. As noted, the Board's investigation showed that Shoreham's use
 of mixed methodologies of cost recovery (actual costs for intrastate,
 average schedule for interstate) resulted in an excessive recovery. As a
 result of Shoreham's use of different cost-allocation methods in different
 jurisdictions, the Board found, Shoreham's ratepayers were paying for some
 of the same plant and expenses twice-once through interstate rates and once
 through intrastate rates. This was made evident by the discovery that
 Shoreham's overall rate of return was 38.8%, far beyond typical rates of
 return for regulated industries, and resulting in a windfall for Shoreham. 
 The use of residual ratemaking, the Board concluded, properly bars Shoreham
 from recovering more than 100% of its revenue requirements, and therefore
 is consistent with state and federal regulatory policy.
 
 ¶ 21. The Board also properly rejected Shoreham's argument that
 interstate revenues were subsidizing intrastate rates as a factual matter,
 noting that to properly analyze the claim it would need to compare
 Shoreham's interstate revenues and costs based on the sort of "proxy"
 methodology which Shoreham provided for its intrastate costs. No proxy
 study for interstate costs was offered, however, because Shoreham does not
 use a cost-based approach for interstate ratemaking. Similarly, Shoreham's
 claim that its actual intrastate costs exceeded its residual-ratemaking
 intrastate costs was based on a proxy study which the Board found to be
 unreliable, a finding which we do not second-guess. In re Cent. Vt. Pub.
 Serv. Corp., 167 Vt. 626, 627, 711 A.2d 1158, 1160 (1998) (mem.). 
 Shoreham's additional reliance on two out-of-state cases to support its
 cross-subsidization claim is equally unpersuasive, as both decisions were
 premised upon a fundamental failure to separate, rather than the use of
 residual ratemaking as a separations methodology. See United States v. RCA
 Alaska Commc'ns, Inc., 597 P.2d 489, 499 (Alaska 1979); Elkhart Tel. Co. v.
 State Corp. Comm'n, 640 P.2d 335, 338 (Kan. Ct. App. 1982).

 ¶ 22. "The statutory basis of the Board's regulatory authority is
 extremely broad and unconfining with respect to means and methods available
 to that body to achieve the stated goal of adequate service at just and
 reasonable rates." In re Green Mountain Power Corp., 142 Vt. at 380, 455
 A.2d at 825. The Board's decision here to apply residual ratemaking to
 Shoreham was well within its authority and was directed at proper
 regulatory objectives. Accordingly, it may not be disturbed. 

 II.

 ¶ 23. Shoreham next claims that the Board violated state law in
 applying residual ratemaking because it lacks authority to use revenues
 from interstate operations to establish just and reasonable intrastate
 rates. Shoreham's argument is premised on the following passage from In re
 New England Telephone & Telegraph Co., 115 Vt. 494, 503, 66 A.2d 135, 141
 (1949):

 [I]t needs no citation of authorities to show that the
 jurisdiction of the commission extends only to intrastate
 operation and matters pertaining thereto. It is so limited by
 statute. . . . The amount of property in this state devoted to
 interstate operations cannot properly be included in a rate base
 used to determine just and reasonable rates to be charged for
 intrastate service. No "end result" could be said to be just and
 reasonable when reached by such a method. 
 
 ¶ 24. Shoreham argues that this passage prohibits the Board "from
 including interstate operations in a rate base . . . to determine just and
 reasonable intrastate rates" and that the residual ratemaking method simply
 reclassifies interstate revenues as intrastate revenues. As previously
 discussed in connection with Shoreham's federal claim, however, the
 residual-ratemaking method properly separates interstate and intrastate
 property, and Shoreham has not established that it results in
 impermissible cross-subsidization. Furthermore, the quoted passage from
 New England Telephone related to a finding incorporating the company's
 average combined interstate and intrastate investment which we forbade the
 Board to use on remand, explaining that the interstate and intrastate
 property must be properly separated between state and federal
 jurisdictions. Id. The case did not concern residual ratemaking, and
 provides no basis to conclude that the Board here exceeded its
 jurisdiction. 

 III.


 ¶ 25. Shoreham next contests the Board's decision to eliminate the
 income-tax expense from its cost of service. The Board noted that
 Shoreham is a Sub-chapter S corporation for income-tax purposes and as such
 does not pay federal or state income taxes as a corporate entity, instead
 "passing through" that tax obligation to its individual shareholders. 
 Shoreham had nevertheless calculated its revenue requirement for
 ratemaking purposes at the 40.44% C-Corporation tax rate for federal and
 state tax payments, and had been collecting those monies from ratepayers. 
 Both the Department and the hearing officer recommended that because
 Shoreham distributes net income to its shareholders who pay taxes at
 individual tax rates of 25.12%, Shoreham's income-tax expense should be
 adjusted to compensate its shareholders at the amount of their 25.12%
 personal income tax rates. Testimony from the Department's Director of
 Finance recognized, however, that the Board had several options, and that
 one of these was to find that personal taxes paid by the shareholders were
 irrelevant to the company's legitimate expenses. In such a case, the Board
 would be justified in disallowing the income tax expense in its entirety.
 
 ¶ 26. In departing from the recommendation of the hearing officer
 and the Department, the Board concluded that it was improper to include an
 income-tax expense because rates are based on adjusted test-year expenses
 and "payment of taxes simply was not one of Shoreham's actual expenses in
 the 2002 test year." (FN4) The Board noted that Shoreham enjoyed other
 benefits from its Sub-chapter S corporate form, and that it was a
 voluntary choice by Shoreham to choose this form. The Board thus concluded
 that it was neither just nor reasonable to require ratepayers to compensate
 Shoreham for a nonexistent tax liability. See Hastings v. Village of
 Stowe, Elec. Dept., 125 Vt. 227, 231, 214 A.2d 56, 59 (1965) (upholding
 Board's elimination of income tax expense not actually incurred). 

 ¶ 27. Although Shoreham suggests that its due process rights were
 somehow compromised by the Board's decision to adopt a position contrary to
 the recommendation of the hearing officer and the Department, we discern no
 violation. As noted, Shoreham was on notice that disallowance was an
 option through the testimony of the Department's Director of Finance. That
 testimony, in turn, supported the view that no income-tax expense should be
 recognized as a legitimate expense if the Board concluded that such taxes
 were irrelevant in the case of a company, such as Shoreham, which simply
 paid no corporate tax. The Board's conclusion in this regard was neither
 contrary to the evidence nor unjust and unreasonable. Accordingly, it may
 not be disturbed.

 IV.

 ¶ 28. Related to its previous claim, Shoreham also disputes the
 Board's order that it establish a liability account for its ADIT and repay
 that amount to ratepayers because Shoreham has no tax liability. In this
 regard, the Board made the following pertinent findings.

 [ADIT] represents the amount of cost-free capital provided by
 customers through rates to pay for anticipated income taxes that
 have been deferred. Differences in the amount of actual income
 taxes paid and the amount of income taxes deferred to a future
 period arise due to the difference in the recognition of revenues
 and expenses for ratemaking purposes and income tax purposes. 
 Shoreham's cost of service filing in this case reflects a rate
 base deduction for ADIT of $611,143 which was based on Shoreham's
 historical application of the C-Corporation income tax rate for
 ratemaking purposes. The balance in Shoreham's ADIT account
 represents customer funds that were paid prior to December 31,
 2002, for future anticipated income tax obligations. Shoreham
 does not pay income taxes but reimburses the shareholders for
 their personal income tax obligation.

 ¶ 29. The parties agreed below that if the Board reduced the
 income-tax expense, it must also reduce the ADIT balance to reflect the
 change in income-tax rates, but disagreed on what to do with the excess
 funds that Shoreham had generated by applying the C-Corporation rates. 
 Shoreham proposed to keep the difference. The Board disagreed. Based on
 its finding that Shoreham pays no state or federal income taxes and thus
 has no future deferred income tax liability, the Board concluded that it
 was a "basic fact" that the existing ADIT account represented ratepayers'
 funds, and ordered Shoreham to return those funds to ratepayers. The Board
 reasoned that it had authorized Shoreham to collect from ratepayers in
 anticipation of future tax liabilities, and that Shoreham knew the funds
 were advance contributions from ratepayers to be held for future
 liabilities. The Board concluded, "[t]his basic fact that the ADIT
 represents customer funds is unchanged now that it is apparent that the
 future liability has now been reduced or eliminated."

 ¶ 30. Shoreham now claims that the Board cannot order return of the
 ADIT funds to ratepayers because it never authorized Shoreham to collect
 ADIT funds in the first place. Because the Board's prior order regarding
 Shoreham's rates was a stipulated bottom-line settlement in which the Board
 did not specifically rule on particular costs, Shoreham asserts that it was
 never actually authorized by the Board to collect income taxes in advance
 from its ratepayers in anticipation of future tax liabilities. 
 Accordingly, Shoreham argues, the ADIT balance must be set at zero.
 
 ¶ 31. We are not persuaded. Whether or not specifically authorized
 by the Board, the evidence shows that Shoreham collected ADIT from
 ratepayers. Shoreham acknowledged as much below, and its own
 cost-of-service filing reflected a rate base deduction for ADIT in the
 amount of $611,143, which had been collected from ratepayers based on
 Shoreham's historical application of the C-Corporation income-tax rate for
 ratemaking purposes. Nor, as Shoreham claims, is the Board's ruling
 inconsistent with its decision to disallow Shoreham's income-tax expense
 going forward. The record and findings support the Board's conclusion that
 Shoreham has been collecting funds from ratepayers for an income-tax
 expense it did not and will not incur; that the ADIT balance represents
 ratepayer funds collected in the past; and that these funds should be
 returned to ratepayers. Nor, finally, does the Board's action amount to
 retroactive ratemaking. "Retroactive ratemaking occurs when rates are set
 at a level that permits a utility to recover past losses, or that requires
 it to refund past excess profits, that resulted from a disparity between
 projected expenses of a prior rate base and actual incurred expenses." In
 re Green Mountain Power Corp., 162 Vt. at 387, 648 A.2d at 380. ADIT funds
 are not profits; they are funds collected from ratepayers to be held for a
 future tax liability that in this case will not arise. The Board did not
 engage in illegal retroactive ratemaking in ordering Shoreham to refund its
 ADIT balance.

 V.
 
 ¶ 32. Shoreham's final two arguments require no extended
 discussion. Shoreham claims that the Board impermissibly exceeded its
 jurisdiction in suggesting that it would likely impute "total company"
 average-schedule ratemaking to Shoreham even if Shoreham decided to make a
 federal-law election to convert to cost basis. The Board's statement in
 this regard was contingent on the effect of such an election on rates, and
 was dictum in any event, concerning a speculative scenario that had not
 occurred and was not before it. Accordingly, the issue is not ripe for
 decision by this Court. See In re Robinson/Keir P'ship, 154 Vt. 50, 57,
 573 A.2d 1188, 1192 (1990) ("Courts will ordinarily not render decisions
 involving events that are contingent upon circumstances that may or may not
 occur in the future.").

 ¶ 33. Lastly, Shoreham asserts that the Board's ruling was
 confiscatory because the shift in revenues will result in intrastate rates
 that fail to compensate Shoreham for its actual intrastate property costs,
 and therefore deprive Shoreham of the value of its interstate property
 without just compensation. We agree with the Department, however, that
 Shoreham failed to properly raise this issue below, and therefore may not
 raise it on appeal. See Town of Hinesburg v. Dunkling, 167 Vt. 514,
 523-24, 711 A.2d 1163, 1168-69 (1998) (issue must be raised below to be
 preserved for review on appeal). While Shoreham cites to two sentences in
 its exceptions to the hearing officer's proposed decision referring to the
 recommended reduction as confiscatory, this was not adequate to afford the
 Board a fair opportunity to address the issue. See In re White, 172 Vt.
 335, 343, 779 A.2d 1264, 1270-71 (2001) (to properly preserve issue for
 review, party must present it with sufficient specificity and clarity to 
 afford trial court fair notice and opportunity to rule on it). Moreover,
 as noted in connection with its subsidization claim, Shoreham provided no
 reliable evidence of its actual intrastate cost to support the assertion
 that confiscation will occur as a result of the Board's order.

 Affirmed.



 FOR THE COURT:



 _______________________________________
 Chief Justice


------------------------------------------------------------------------------
 Footnotes


FN1. Historically, AT&T used a cost-based separations approach to determine
 each Bell Operating Company's costs of providing interstate service, which
 the FCC later codified in its rules after the divestiture of AT&T in 1983. 
 Pine Tree Tel. & Tel. Co. v. Pub. Utils. Comm'n, 631 A.2d 57, 63 (Me.
 1993); Mid-Plains Tel. Co., 5 F.C.C.R. 7050. For small, independent
 telephone companies, the FCC allowed AT&T to distribute revenues by a
 system of "settlements" based on "average schedules." Pine Tree, 631 A.2d
 at 63. Those small, independent companies are still, today, allowed to use
 average schedules to estimate their interstate costs. Id.

FN2. Under FCC rules, LECs receive compensation, or "access revenue," from
 interstate carriers for use of the LEC local networks. See 47 C.F.R. §
 32.5082. Many smaller LECs, including Shoreham, participate in an
 "interstate access pool," administered by the National Exchange Carrier
 Association. See id. §§ 69.601-69.612. LECs recover "settlements" from
 the pool to recover costs of providing interstate services plus a pro rata
 share of the pool's interstate earnings. See id. § 69.605(a). Companies
 are categorized as "cost-based" or "average schedule" for purposes of
 recovering their federal jurisdictional costs from the interstate
 settlement pool.

FN3. A company's "revenue requirement" is the total amount that a carrier is
 entitled to charge for expenses." La. Pub. Serv. Comm'n, 476 U.S. at 365. 
 It is the "sum of [the carrier's] current operating expenses, including
 taxes and depreciation expenses, and a return on its investment 'rate
 base.' " Id. The "rate base" has been described as the "net value of the 
 property upon which a return should be earned." In re Vt. Tel. Co., 169
 Vt. 476, 482, 739 A.2d 671, 675-76 (1999) (quotation omitted). 

FN4. In its order regarding Shoreham's motion to alter or amend, the Board
 increased Shoreham's expenses slightly, by $4,773, to treat Shoreham's
 owner-investors the same as other Vermont investors of public companies
 with regard to investment earnings.